**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI-DADE DIVISION**


RAY WILLIAMS;
LUIS JUAREZ; and MIGDALIAH JUAREZ;
on behalf of themselves and all others
similarly situated;

                                       **CLASS ACTION**

        Plaintiffs,

                                         **JURY DEMAND**

v.

WELLS FARGO FINANCIAL INC;
WELLS FARGO FINANCIAL AGENCY COMPANY.;
WELLS FARGO FINANCIAL AMERICA INC.;
WELLS FARGO FINANCIAL FLORIDA INC.;
WELLS FARGO SERVICING SOLUTIONS, LLC;
WELLS FARGO FINANCIAL LEASING INC.;
WELLS FARGO FINANCIAL SYSTEM FLORIDA INC.;
WELLS FARGO INSURANCE;
QBE INSURANCE CORPORATION; and
STERLING NATIONAL INSURANCE
AGENCY

        Defendants.
_____/

## CLASS ACTION COMPLAINT

      Plaintiffs, RAY WILLIAMS, LUIS JUAREZ, and MIGDALIAH JUAREZ

("Plaintiffs"), on behalf of themselves and all others similarly situated, file this class

action complaint against QBE INSURANCE CORP., STERLING NATIONAL

INSURANCE AGENCY, WELLS FARGO FINANCIAL INC, WELLS FARGO

FINANCIAL AGENCY CO., WELLS FARGO FINANCIAL AMERICA INC., WELLS

FARGO FINANCIAL FLORIDA INC., WELLS FARGO FINANCIAL LEASING INC.,

WELLS FARGO SERVICING SOLUTIONS, LLC, WELLS FARGO FINANCIAL

SYSTEM FLORIDA INC., and WELLS FARGO INSURANCE, (collectively

"Defendants") and allege as follows:

## I. INTRODUCTION

1.      This is a class action lawsuit filed to redress injuries that Plaintiffs, and a nationwide class of consumers, have suffered and will continue to suffer as a result of the practices of Defendants relating to force-placed insurance policies.

2.      Defendants are force-placed insurance providers, managing general agents/surplus lines insurance agents, captive insurance agents, and mortgage loan servicers who have engaged in a pattern of unlawful, deceptive, unfair, and unconscionable profiteering and self-dealing in regards to force-placed insurance policies procured in connection with Plaintiffs' and the proposed Class's residential mortgage loans.

3.      Defendants' unlawful actions include, *inter alia*, purchasing unconscionably high-priced insurance policies, having pre-arranged agreements to purchase force-placed insurance from a single company without seeking competitive bids on the open market to maximize their own profits, backdating the force-placed policies to charge for retroactive coverage, and giving and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies.  These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of the named Plaintiffs and the Class members.

4.      As detailed more fully below, the unlawful scheme usually begins when a homeowner's insurance policy has lapsed often because the homeowner is already struggling to pay on a costly mortgage (often substantially greater than the value of the home) or sometimes due to no fault of the homeowner, for example, when an insurance

company declines to continue insuring homes on the Florida coastline and the homeowner does not receive notice of the cancellation or a clerical error at the insurance company mistakenly shows that a policy has expired.

5.      Once an insurance policy has lapsed, the mortgage servicer can purchase insurance for the home, "force-place" it, and then charge the borrower the full cost of the premium.

6.      Instead of seeking to maintain the borrower's delinquent existing policy or seeking bids for the force-placed insurance on the open market, the mortgage servicers have entered into exclusive relationships with certain force-placed insurance providers and continually purchase the force-placed insurance policies from these same providers.

7.      Accordingly, no arms-length transactions are taking place.  Indeed, the mortgage servicers and the force-placed insurance providers can often be found working out of the same offices.

8.      Moreover, when borrowers have had just temporary lapses in their policy, the mortgage service providers have retroactively "placed" the force-placed insurance policy on the property for that period of time.  In these situations, the borrowers are charged an unreasonable premium for the retroactive force-placed insurance despite the fact that the time has lapsed, the homeowner has since secured his or her own standard insurance, and no claims were made during the lapsed period.

9.      This retroactive force-placed insurance is especially egregious given the fact that the National Association of Insurance Commissioners has already stated that insurance is "prospective in nature" and that policies should not be backdated.

10.      Homeowners' mortgage payments often include an amount to be placed in

escrow so that the mortgage servicers can pay the insurance when it is due.  However, mortgage servicers, in instances where a homeowner has missed mortgage payments, have often stopped forwarding the homeowner's insurance payments to the insurance company and then purchased force-placed insurance for the lapsed policy.  This occurs even when the borrower has paid enough into escrow to cover the insurance payments.

11.     Furthermore, these fraudulent practices have recently come under fire by all fifty State Attorney Generals.  Pursuant to their nation-wide investigation into lenders and mortgage servicers related to the housing and foreclosure crisis, they have recently proposed Settlement Terms several of which involve force-placed insurance.

12.     The proposed settlement terms include, among other things, the following proposed restrictions: (1) mortgage servicers are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (2) mortgage servicers cannot force-place insurance that is in excess of the replacement cost of the improvements on the mortgaged property; (3) mortgage servicers are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (4) mortgage servicers are prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or placement of the force-placed insurance; (5) mortgage servicers have to make reasonable efforts to continue or reestablish the borrower's existing insurance policy if there is a lapse in payment; and (6) the mortgage servicer is required to purchase the force-placed insurance for a commercially reasonable price.

13.     As the State Attorney Generals have recognized, this practice has greatly

contributed to the foreclosure crisis.  When the excessively priced insurance is force-placed on homeowners, already struggling to keep up with their mortgage payments, it often pushes those homeowners into foreclosure.  The force-placed insurance premium is placed right into the borrower's mortgage payment, raising the amount of that payment to far more than what the borrower is able to pay.

14.     Force-placed insurance policies are generally meant to protect a mortgagee's interest in the borrower's property when the borrower's insurance policy has lapsed.  Defendants, however, have turned them into a severely inflated profit-making endeavor.

15.     Mortgage Servicers – like Wells Fargo here – are companies that contract with the owners/investors of residential mortgage loans to administer those loans on behalf of the owners/investors.  They are responsible for the day-to-day management of the mortgage loan account, including collecting and crediting the monthly loan payments, handling the escrow account, and otherwise handling customer service and management of the mortgage loans within their servicing portfolio.

16.     Mortgage servicers do not actually own the mortgages that they service, instead they simply contract with the owners/investors of the mortgage loans to manage the loans in their portfolio on the owners/investors behalf and receive various fees in return.  These fees are paid by the owners/investors who do in fact own the beneficial interest in those loans.

17.     Because they do not own the loans that they service, mortgage servicers do not incur a financial loss if a borrower fails to pay the mortgage, or if the loan goes into foreclosure.

18.     Surplus-line insurance brokers – Sterling National here – have the ability to procure insurance policies from carriers that are not licensed by the respective states when state-licensed insurers will not accept the risk on a certain policy.

19.     Surplus-line insurance providers – like QBE here – are not subject to the regulations of the states they provide the surplus line insurance to, often in the form of force-placed insurance, as is the case here.

20.     The premiums on force-placed insurance policies generally cost at least five to six times and often up to ten times more than what the borrower was either originally paying or what the borrower could obtain on the open market.

21.     The force-placed insurance policies are extremely lucrative for the insurance providers and generate profit margins unheard of elsewhere in the insurance industry.  Indeed, one leading insurance provider – Assurant Inc. – collected $2.7 billion of premiums in 2010 through its force-placed insurance division alone.

22.     The force-placed insurance policies are not just lucrative for the insurance providers.  The mortgage servicers also reap significant profits when a struggling homeowner's insurance policy lapses.

23.     The mortgage servicers are paid commissions or kickbacks from the force-placed insurance companies once one of the high-priced, force-placed, insurance policies is purchased.  These kickbacks are directly tied to the cost of the force-placed insurance and are usually a percentage of the total cost of the policy.

24.     This arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy that it can – the higher the cost of the insurance policy, the higher their commission or kickback.

25.    The full price of the force-placed insurance policy (without accounting for the kickback that is paid back to the servicer) is placed upon the borrower by the mortgage servicer and can often force an already struggling homeowner into foreclosure.

26.    In some instances, premiums for force-placed insurance have been placed on borrowers that are in excess of their mortgage's face value and the property's overall worth.

27.    Mortgage servicers consistently choose force-placed insurance arrangements that reward themselves at the expense of the borrowers. The National Association of Insurance Commissioners stated that mortgage servicers "have no incentive to select a competitively priced product" but instead would select one "where they are provided with an incentive or inducement to enter into the transaction."

28.    Borrowers are at the complete mercy of the mortgage servicers and their arrangements with the insurance providers.  Borrowers can select a lender or mortgage broker for their loan but cannot select what company services that loan.  Indeed, mortgage loans are often sold shortly after origination and change hands many times as they are sold in the market.

29.    Moreover, this scheme does not injure the borrower alone.  As explained above, the unreasonable cost of the force-placed insurance can often push a homeowner into foreclosure.  This proves to be extremely lucrative for the mortgage servicer and usually a considerable loss for the ultimate owner of the mortgage – investors in mortgage-backed securities.

30.    The proceeds of a house sold at a foreclosure auction will go to the mortgage holder – the investors – however they only receive whatever money is left after

expenses, which includes the cost of force-placed insurance. Therefore, it is in the interest of a mortgage servicer to place a high-cost policy on a struggling borrower and this interest is directly aligned against the interest of not only the borrower but the investors. The mortgage servicer will collect a huge profit (much more than the $50 it was making in servicing the loan) and the borrowers and investors are the ultimate losers.

31. This scheme of exclusive relationships, back-room deals, and kickbacks appears to be wide-spread in the industry. *See Abels v. JPMorgan Chase*, 678 F. Supp. 2d 1273 (S.D. Fla. 2009) (denying motion to dismiss class action complaint against mortgage service provider JP Morgan Chase for kickbacks received and the excessive cost of force-placed insurance); *Brand v. Nat'l Bank of Commerce*, 213 F.3d 636 (5th Cir. 2000) (upholding class certification where Plaintiffs alleged excessive insurance coverage and unlawful kickbacks related to force-placed insurance); *Hall v. Midland Group*, No. CIV.A 99-3108, 2000 WL 1725238 (E.D. Pa., November 20, 2000) (certifying a settlement class of plaintiffs who alleged that the force-placed insurance was excessive and unauthorized and that the mortgage servicer was receiving improper commissions).

## II. PARTIES

32. Plaintiffs, RAY WILLIAMS, LUIS JUAREZ, and MIGDALIAH JUAREZ are natural persons, over the age of 21 and otherwise *sui juris*.

33. Defendants, WELLS FARGO FINANCIAL INC, WELLS FARGO FINANCIAL AGENCY CO., WELLS FARGO FINANCIAL AMERICA INC., WELLS FARGO FINANCIAL FLORIDA INC., WELLS FARGO FINANCIAL LEASING INC., WELLS FARGO FINANCIAL SYSTEM FLORIDA INC and WELLS FARGO

SERVICING SOLUTIONS, LLC ( collectively "Wells Fargo"), are a subsidiary of Wells Fargo N.A. with their principal place of business in Iowa.  The Wells Fargo entities above act as a mortgage service provider with all of them either registered or doing business in the state of Florida.

34.    Defendant, WELLS FARGO INSURANCE INC. ("Wells Fargo Insurance"), is a subsidiary of Wells Fargo, N.A. registered to do business in the state of Florida with its principal address in Minnesota. Wells Fargo Insurance is a captive insurance agent and primarily an instrumentality of Wells Fargo.  Upon information and belief, Wells Fargo Insurance does nothing to assist in obtaining the force-placed insurance policy and exists only to collect kickbacks or commissions related to the force-placed insurance policies.

35.    Defendant, QBE SURPLUS LINES INSURANCE CO. ("QBE"), is a surplus line insurance provider doing business in the state of Florida.  QBE also recently agreed to pay $700 million in cash to Bank of America to purchase their force-placed insurance subsidiary – Balboa.

36.    Defendant, STERLING NATIONAL INSURANCE AGENCY ("Sterling National"), is a managing general agent/surplus-line insurance broker doing business in the state of Florida.  Sterling National only writes for Defendant QBE and was recently purchased by QBE.

### III. JURISDICTION AND VENUE

37.    The Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.), requires that this action be brought before this Court.

38.     This Court has jurisdiction over Defendants because they are either foreign corporations authorized to conduct business, are doing business in Florida and have registered with the Florida Secretary of State, or they do sufficient business, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgage or other lending services and insurance policies in Florida.  Accordingly, this purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

39.     This Court has subject matter jurisdiction because the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees, and diversity exists between the Plaintiff and the Defendants.  28 U.S.C.A. § 1332(a)(1).

40.     In addition, this Court also has subject matter jurisdiction because the amount in controversy exceeds $5 million and diversity exists between the Plaintiffs and the Defendants.  28 U.S.C.A. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

41.     Venue is proper in this forum because at all times relevant hereto, Plaintiffs resided in the Southern District of Florida, and a substantial portion of the practices complained of herein occurred in the Southern District of Florida, and/or because Defendants have received substantial compensation as a result of doing business in the Southern District of Florida.  Moreover, at all times material to the allegations contained herein, Defendants personally and/or through an agent:

(a) operated, conducted, engaged in, and carried on a business venture in the Southern District of Florida or had an office or agency in the Southern District of Florida; and/or

(b) engaged in substantial activity within this state and district.

42.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Southern District of Florida and, as set forth above, Defendants are subject to personal jurisdiction in this district.

43.     All conditions precedent to this action have occurred, been performed, or have been waived.

## IV. FACTUAL ALLEGATIONS

44.     Pursuant to the mortgage loan documents, borrowers, including Plaintiffs, are required to maintain insurance on their real property.  If the borrower fails to maintain insurance, the mortgage servicer may forcibly place insurance on the property.

45.     Plaintiff, Ray Williams, obtained a mortgage from Wachovia Bank secured by parcel of real property in Miami-Dade County, Florida and has a mortgage balance of approximately $85,000.  The mortgage loan was serviced by Defendant Wells Fargo.

46.     From the inception of the mortgage until October 17, 2010, Mr. Williams maintained in full force and effect the insurance required by the mortgage contract.  The monthly premium for the contract was approximately $293.  However, on October 17, 2010, the policy lapsed because Mr. Williams' original insurance provider dropped his coverage.

47.     A short time later, on November 15, 2010, Mr. Williams, after a diligent effort to do so, secured new insurance for the property.  Mr. Williams' insurance had lapsed for less than 30 days.

48.     Thereafter, Wells Fargo, without seeking competitive bids on the open market or attempting to re-establish Mr. Williams' prior insurance, capriciously exercised its discretion in choosing an insurance policy and contracted with Sterling National to obtain surplus-line, force-placed, insurance through its preferred provider, QBE, for Mr. Williams' property.

49.     By selecting QBE, Sterling National never even attempted to comply with the express requirements set forth in sections 626.915 and 626.916(1)(a), Florida Statutes, that obligate it to make reasonable efforts to obtain insurance from a Florida admitted carrier and to document those efforts.

50.     On December 27, 2010, nearly six weeks after Mr. Williams had purchased insurance for his property, Wells Fargo notified him that it was retroactively force-placing an insurance policy on the property for the approximate 30-day lapsed period and adding the cost of the premium to his mortgage loan.

51.     The cost of the premium of the force-placed insurance policy through QBE totaled approximately $1,743 for just the approximate 30-day lapsed period.  This is nearly 6 times the amount of the monthly premium ordinarily paid by Mr. Williams.  Moreover, if paid out for a full year, it is equal to nearly 25% of Mr. Williams' outstanding principal mortgage balance.

52.     Wells Fargo notified Mr. Williams that the force-placed insurance policy had been secured and retroactively placed.  The notification, however, did not disclose

that Wells Fargo or an affiliate, subsidiary, or related company would derive a profit or financial windfall because a percentage of the premium of the force-placed insurance policy – the entirety of which was charged to Mr. Williams' account – would be paid back to Wells Fargo or a related entity in the form of "kickbacks" and/or "commissions."

53.     Further, the language of the notification is plainly contradictory.  It states that Mr. Williams was to be charged only for the days that the policy "was in force." However, it is quite impossible for the policy to have been "in force" six weeks prior to it even being purchased.

54.     Mr. Williams spent weeks attempting to speak (by phone, email and in person) to someone at Wells Fargo that could explain to him why he was being charged such an extreme amount for insurance for a time period that had long since passed.  No one at Wells Fargo was willing to adequately explain the situation to Mr. Williams or sufficiently address his questions.

55.     Plaintiffs, Luis and Migdaliah Juarez, obtained a mortgage from Wachovia Bank secured by parcel of real property in Miami-Dade County, Florida.  The loan was serviced by Defendant Wells Fargo.

56.     Mr. and Mrs. Juarez maintained in full force and effect the insurance required by the mortgage contract.  However, the policy lapsed because the Juarez's original insurance provider – State Farm – dropped their coverage due to damage to their roof.

57.     Mr. Juarez was unable to immediately obtain new insurance because the insurance companies he contacted would not insure the home until Mr. Juarez had the roof completely fixed.  Mr. Juarez contacted Wells Fargo to inform them that he was in

the process of fixing his roof and obtaining new insurance.

58.     In August 2010, after the completion of his roof repairs, Mr. Juarez obtained insurance through Citizens Property Insurance Corporation and immediately sent proof of this insurance to Wells Fargo.

59.     Wells Fargo, without seeking competitive bids on the open market or attempting to re-establish Mr. Williams' prior insurance, capriciously exercised its discretion in choosing an insurance policy and contracted with Sterling National to obtain surplus-line, force-placed, insurance through its preferred provider, QBE, for Mr. and Mrs. Juarez's property.

60.     By selecting QBE, Sterling National never even attempted to comply with the express requirements set forth in sections 626.915 and 626.916(1)(a), Florida Statutes, that obligate it to make reasonable efforts to obtain insurance from a Florida admitted carrier and to document those efforts.

61.     On July 16, 2010, nearly four months after Mr. Juarez's prior policy had been dropped due to the roof damage, Wells Fargo notified him that it was force-placing an insurance policy on him for a period of March 3, 2010 to March 3, 2011.

62.     Despite being purchased in July 2010, the insurance policy, secured through QBE, was backdated to over four months prior (March 3, 2010) notwithstanding the fact that there was no damage to the property or claims arising out of the Juarez's property for that four-month period.

63.     The cost of the annual premium of the force-placed insurance policy through QBE totaled approximately $25,000.  This is nearly four times the amount of the premium now paid by Mr. and Mrs. Juarez through the state-run Citizens Property

Insurance Corporation.  The cost of the force-placed insurance premium is even more shocking considering that Citizen's Property Insurance Corporation typically charges Florida's highest legal rate (the highest approved rate by the Florida Office of Insurance Regulation).

64.     Wells Fargo notified the Juarez family that the force-placed insurance policy had been secured and retroactively placed.  The notification, however, did not disclose that Wells Fargo or an affiliate, subsidiary, or related company would derive a profit or financial benefit because a percentage of the premium of the force-placed insurance policy – the entirety of which was charged to Mr. and Mrs. Juarez's account – would be paid back to Wells Fargo or a related entity in the form of "kickbacks" and/or "commissions."

65.     Mr. Juarez spent weeks attempting to contact (by phone and mail) someone at Wells Fargo that could explain to him why he was being charged such an extreme amount for the insurance premium and furthermore why the policy was backdated for a four-month time period.  No one at Wells Fargo was willing to adequately explain the situation to Mr. Juarez or sufficiently address his questions.

66.     Wells Fargo continually used QBE to force-place insurance on Plaintiffs and the class and never attempted to seek competitive bids or re-establish the prior insurance policy because of the outrageous profits the Defendants derive from their scheme.

67.     Defendants improperly engaged in self-dealing at the expense of Plaintiffs and the Class, in a manner not disclosed by the mortgage nor within the reasonable contemplation of the parties by charging Plaintiffs and the Class the full amount of the

exorbitantly-priced, force-placed insurance policies and paying and receiving a percentage of the premium to each other, thereby enabling Defendants to earn a hidden profit and financial windfall.

68.     Defendants' excessively-priced insurance premiums violate the mortgage contract because they exceed the cost of the services and are not reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument.

69.     Borrowers, like Plaintiffs and the Class Members, are notified in their mortgage contracts that the cost of the insurance may be higher than the amount they would typically pay for insurance obtained on the open market.

70.     These standard mortgage contracts state that the insurance will cover the lender but may or may not protect the borrower or the contents of the property, and further state that the lender is under no obligation to purchase any particular type or amount of coverage.  There are no insurance rates or premiums set forth in the mortgage contract for the cost of force-placed insurance policies.

71.     The mortgage contract does not disclose, however, that Wells Fargo or Wells Fargo Insurance will receive a commission or kickback from QBE or Sterling National for purchasing the insurance from them.  The mortgage contract also does not disclose that this commission will be based upon a percentage of the cost of the premium of the force-placed insurance.  Instead, the contract misrepresents to borrowers that the cost of the force-placed insurance may be higher due to the "risk" the borrower poses or the costs incurred in securing the policies.

72.     Wells Fargo disingenuously claims that it incurs expenses in locating the

force-placed insurance and uses the assistance of a licensed insurance agency – its own subsidiary Wells Fargo Insurance – to act as an agent for the insurance company.

73.     In fact, the "expenses" Wells Fargo incurs are next to nothing.  Wells Fargo has pre-existing relationships with the Sterling National and QBE and incurs almost no costs (in time or money) in securing a force-placed insurance policy.  Wells Fargo contracts almost exclusively with Sterling National and QBE when seeking force-placed insurance.

74.     Indeed, in accord with their agreement, Sterling National and/or QBE perform most if not all of the administrative functions relating to securing the force-placed insurance, including searching Wells Fargo's records for lapsed insurance policies

75.     The "licensed insurance agency" that Wells Fargo uses, Wells Fargo Insurance, is simply an affiliate or subsidiary and exists only to collect the kickbacks or commissions collected from QBE or Sterling National for "finding" the force-placed insurance policy.

76.     Plaintiffs and the class members do not have any choice or input into what company is used to force-place the insurance policy, what expenses are incurred in "finding" an insurance company, and further they do not have the option to shop for the insurance service themselves.

77.     The force-placed insurance policies are not the same type of policy that is authorized or required by the mortgage contract and is not one that a borrower could find on the open market.

78.     Upon information and belief, Wells Fargo has negotiated deals with QBE and Sterling National whereby it receives a percentage of the cost of the premiums of the

force-placed insurance policy purchased for the borrower. This commission or kickback encourages the Defendants to select the most expensive insurance policy despite not having an interest in the insured collateral.

79. The commission or kickback is paid by QBE or Sterling National to Wells Fargo or its affiliate in order to induce them to purchase excessively-priced, force-placed insurance policies.

80. Wells Fargo charges Plaintiffs and the class the full amount of the over-priced premium for the insurance policy despite being paid the kickback percentage of the policy. The insurance policies also often charge borrowers for unnecessary insurance items.

81. This scheme allows both Wells Fargo – through kickbacks – and QBE or Sterling National – through excessively-priced premiums – to reap huge profits at the cost of the Plaintiffs, the Class Members, or ultimately the investors.

82. By securing these force-placed insurance policies through these exclusive relationships and not seeking competitive bids on the open market or attempting to continue or reestablish the prior insurance policy, Wells Fargo is not only obtaining the highest non-competitive premium rate, but it is also engaging in self-dealing and profiteering.

83. The kickbacks and commissions that Wells Fargo can earn on the force-placed insurance policies are far greater than what it can earn on servicing a loan (approximately $ 50 per loan) which provides increased incentive for it to continue with this deceptive and unsavory practice.

84. Moreover, despite the claims that Wells Fargo makes to borrowers, they

do not incur significant costs in placing the insurance policy.  Upon information and belief, QBE and/or Sterling National have entered into agreements with Wells Fargo whereby they will search its servicing portfolios to detect uninsured properties and will even perform other back-office administrative functions.

85.    The actions and practices described above represent unfair, deceptive, and fraudulent practices that, even if the terms of the mortgage could be construed to allow, would still be an abusive and unlawful use of its contract powers.  Placing these unreasonably priced insurance policies on Plaintiffs and the similarly situated Class Members without regard for competition on the open market or a commercially reasonable price solely to maximize their own profits through the exorbitant cost of and by collecting kickbacks on those policies is inherently unfair and deceptive and prohibited by state and Federal law.

86.    The actions and practices described above have improperly deprived Plaintiffs and similarly situated Class Members of significant funds and have at times led to the loss of their homes.  Plaintiffs were unlawfully charged excessive and egregious amounts which Defendants knew were out of line with policy premiums available on the open market.  Defendants selected these high-priced insurance policies solely because of the kickbacks and commissions and the huge profits they reap from it.

## V. CLASS ALLEGATIONS

### A.    Class Definition

87.    Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  Plaintiffs seek to represent the following two classes:

Nationwide Class

> All individuals who were charged for a force-placed insurance policy placed on their property through Defendants – Wells Fargo, QBE, and Sterling National and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

Subclass ("Florida Subclass"):

> All individuals with mortgages on property located in Florida who, within the applicable statute of limitations preceding the filing of this action, were charged for a force-placed insurance policy placed on their property through Defendants – Wells Fargo, QBE, and Sterling National and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

88.     Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

89.     Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is the Defendants' standard and undisputed business practices.

**B.     Numerosity**

90.     The individual class members are so numerous that joinder of all members is impracticable.  The Defendants sell and service a large amount of mortgage loans and insurance policies in the state of Florida and nation-wide and have, as a general business practice, failed to comply with Federal and Florida state law.  Moreover, the individual class members are ascertainable as the names and addresses of all class members can be

identified in the business records maintained by the Defendants.  The precise number of class members is certainly more than a thousand but can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint and impractical for each to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

### C.    Commonality

91.    There are questions of law and fact that are common to the Plaintiffs' and Class Members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

(a) Whether the premiums charged to Plaintiffs and the Class were *bona fide* and reasonable under Federal law;

(b) Whether the kickbacks and commissions received by and paid by the Defendant companies constituted unfair and deceptive business practices and violated state consumer protection laws;

(c) Whether Defendants purposely placed higher-priced insurance premiums on Plaintiffs and the Class in order to maximize their own profits;

(d) Whether Wells Fargo breached the mortgage contract with Plaintiffs and the Class by failing to seek competitive bids on the open market or attempting to continue or reestablish the prior existing policies;

(e) Whether Defendants have unlawfully unjustly enriched themselves at the expense of the Plaintiffs and the Class;

(f) Whether Defendants breached the implied covenant of good faith and fair dealing by charging their residential borrowers excessive amounts for force-placed insurance, a portion of which was paid back to the mortgage servicer in the form of commissions or kickbacks, and misrepresenting why the cost of force-placed insurance was excessive;

(g)   Whether the provision in the mortgage instrument relating to force-placed insurance is procedurally and substantively unconscionable because it does not contemplate or authorize Defendants to derive hidden financial benefits by force-placing the high cost insurance premiums; and

(h)   Whether an objective consumer would be deceived by Defendants' arrangement and scheme, which incentivizes all the Defendants to charge excessive fees for force-placed insurance and therefore constitutes a violation of deceptive and unfair trade practices under Florida law.

**D.    Typicality**

92.   Plaintiffs are members of the Class as Defendants' own records plainly reveal.  Plaintiffs' claims are typical of the claims of the Class because of the similarity, uniformity, and common purpose of the unlawful conduct of Defendants.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**E.    Adequacy of Representation**

93.   Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

94.   To prosecute this case, Plaintiffs have chosen the law firms of Kozyak, Tropin & Throckmorton, P.A., The Merlin Law Group, P.A., Harke Clasby & Bushman LLP, and The Law Offices of Jeffrey N. Golant, P.A.  These firms are very experienced

in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

### F.   Requirements of Fed. R. Civ. P. 23(b)(3)

95.   The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured.

96.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

97.   As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

### G.   Superiority

98.   A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

> (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;
>
> (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.      Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

99.      Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

100.      Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

<u>**COUNT I**</u>

<u>**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO ALL CLASS MEMBERS**</u>

101.      Plaintiffs re-allege and incorporate Paragraphs 1 – 100 above as if fully set forth herein and further allege as follows.

102.      Good faith and fair dealing is an element of every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its

performance.

103.    Where an agreement permits one party to unilaterally determine the extent of the other's required performance, an obligation of good faith in making such determination is implied.    Mortgage servicers, like Wells Fargo, are permitted to unilaterally choose the company to purchase force-placed insurance from and have an obligation not to exercise their discretion to choose the company capriciously and in bad faith (for their own financial gain) instead of seeking to continue or reestablish the prior insurance policies or seeking competitive bids on the open market in good faith.

104.    The mortgage contracts and insurance policies of Plaintiffs contained an implied covenant of good faith and fair dealing whereby Defendants agreed to perform the obligations under the policies in good faith, to deal fairly with Plaintiffs and the Class, and not to charge excessive or unreasonable fees for the force-placed insurance for the purposes of maximizing profits at the Class's expense.

105.    Defendants breached their duty of good faith and fair dealing in at least the following respects:

> (a) Using their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting exorbitantly-priced force-placed insurance policies to maximize their own profits;

> (b) Failing to seek competitive bids on the open market and instead creating "back room" deals whereby the insurance policies are continually purchased through the same companies;

> (c) Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and Class and misrepresenting the reason for the cost of the policies;

> (d) Collecting a percentage of whatever premiums are charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible; and,

(e) In relation to some members of the Class, including the Class Representatives, retroactively placing the exorbitantly-priced policies for time periods that have already passed.

106.    As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

107.    **WHEREFORE,** Plaintiffs on behalf of themselves and similarly situated Class members, seek a judicial declaration determining that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.  Plaintiffs also seek compensatory damages resulting from Defendants' breach of their duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorney fees and costs.

## COUNT II

## VIOLATION OF THE REAL ESTATE SETTLEMENT AND PROCEDURE ACT ("RESPA") 12 U.S.C. § 2601 *et seq*. (against Defendant Wells Fargo

108.    Plaintiffs re-allege and incorporate Paragraphs 1 – 100 above as if fully set forth herein and further allege as follows.

109.    Plaintiffs' and the class's mortgage loans qualify as "federally related mortgage loans" under § 2602(1)(B)(i) because the mortgage loans were made in whole or in part by a lender, the deposits or accounts of which are insured by any agency of the Federal Government, or were made in whole or in part by a lender which is regulated by any agency of the Federal Government.

110.    This claim for relief arises under 12 U.S.C. § 2605 which authorizes

damages in a class action for:

> (A) any actual damages to each of the borrowers in the class as a result of the failure of Defendant's to comply with any provision of the section; and
>
> (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not greater than $1,000 for each member of the class.  Section 2605 states that the total amount of damages under this subparagraph in any class action may not exceed the lesser of (i) $500,000 or (ii) 1 % of the net worth of servicer.

111.    This section requires that all charges related to force-placed insurance, apart from charges subject to state regulation as the business of insurance, related to force-placed insurance imposed on the borrower by or through the servicer shall be ***bona fide and reasonable***.

112.    Wells Fargo is a mortgage servicer or lender to whom the requirements of section 2605 of RESPA apply.

113.    Sterling National and QBE are surplus-line insurance providers and not subject to state regulation.

114.    Wells Fargo has violated § 2605 of RESPA by charging premiums that are unfairly and egregiously costly.  This excessively-priced, force-placed insurance cannot be considered *bona fide* and reasonable because Wells Fargo exercised their discretion in choosing an insurance policy capriciously, in bad faith, and in contravention of the

parties' reasonable expectations by purposefully selecting an exorbitantly-priced policy and by giving and receiving kickbacks for the procurement of these exorbitantly-priced, force-placed insurance policies.  It has negotiated exclusive terms with National Sterling and QBE whereby it receives kickbacks tied to the cost of the insurance premiums.  This incentive drives Wells Fargo to purchase the highest priced insurance that it can, and to often include coverage that is unnecessary.

115.     The force-placed insurance purchased by Wells Fargo and passed on to Plaintiffs and the Class can cost up to ten times the amount of standard insurance that a borrower was previously paying or could obtain on the open market.

116.     Furthermore, the high-priced premiums charged to Plaintiffs and the Class cannot be considered reasonable because, despite Wells Fargo receiving a kickback or commission on each policy it purchases, it does not pass that savings amount on to Plaintiffs or the Class.   Instead, it still charges them the full unwarranted and unreasonable amount for the exorbitantly-priced, force-placed insurance.

117.     The foregoing actions constitute a general business practice and pattern of Wells Fargo.

118.     **WHEREFORE**, Plaintiffs and the Class members seek a judgment in their favor against Wells Fargo for the actual damages suffered by them in the form of unreasonable force-placed insurance premiums in violation of Section 2605 of RESPA, together with additional damages the court may allow as a result of the pattern of purchasing high-priced and unnecessary force-placed insurance in order to collect a large kickback or commission.  Plaintiffs also seek all costs of litigating this action including attorney fees.

## COUNT III

## UNCONSCIONABILITY

119.     Plaintiffs re-allege and incorporate Paragraphs 1 – 100 above as if fully set forth herein and further allege as follows.

120.     The provision in the standard mortgage instrument that allows Wells Fargo to force-place high-cost insurance and charge borrowers the "cost" of obtaining that insurance and/or misrepresents why the cost of force-placed insurance is excessive is procedurally and substantively unconscionable.

121.     While this standardized provision states that the cost of the force-placed insurance might exceed the cost of insurance that a borrower could obtain, it does not authorize or contemplate that Wells Fargo or Defendants will derive hidden profits and a financial windfall by charging the borrower for the full price of the premium although a percentage of that premium is paid back to Wells Fargo or a related entity in the form of commissions and kickbacks.   No reasonable person would agree to the foregoing provision if they were aware that a portion, based upon a percentage of the cost, was being paid back to the mortgage servicer or if they were aware that the Defendants would have an incentive to choose an exorbitantly-priced policy in order to reap huge profits off of the borrowers.

122.     Plaintiffs and the Class are borrowers and were not in a position to negotiate the terms of the mortgage and were also not in a position to know of or experience the results of Defendants' practices before obtaining their mortgages.

123.     Considering the business acumen and experience of Defendants in relation to Plaintiffs and the Class, the great disparity in the parties' relative bargaining power, the

inconspicuousness and incomprehensibility of the contract language at issue, the purpose and effect of the applicable terms, the allocation of the risks between the parties, and other public policy considerations, the provision in the mortgage instrument relating force-placed insurance is procedurally unconscionable.

124.    The same provision is substantively unconscionable because it does not disclose nor contemplate that Defendants will derive hidden profits and a financial windfall from force-placed insurance through exclusive relationships and kickbacks.  No reasonable person would have contemplated or agreed to the foregoing provision if they were aware that a percentage of the cost of the force-placed insurance would be paid to the mortgage servicer and would provide Defendants the incentive to place excessively priced insurance on the mortgage loan.

125.    **WHEREFORE**, based on the procedural and substantive unconscionability of the contract provision at issue, Defendants should be required to refund an amount equal to all hidden profits or other financial benefits previously collected from Plaintiffs and members of the Class, and to rescind all such amounts charged but not yet collected from Plaintiffs and the Class.

## COUNT IV

## UNJUST ENRICHMENT

126.    Plaintiffs re-allege and incorporate Paragraphs 1 – 100 above as if fully set forth herein and further allege as follows.

127.    The Defendants have received, and continue to receive, a benefit at the expense of the Plaintiffs and the Class, and have knowledge thereof.

128.    The Defendants have unlawfully and unfairly charged, attempted to

collect, and collected, excessive amounts for force-placed insurance policies when reasonably priced insurance could have been obtained on the open market or maintained through Plaintiffs' and the Class's prior insurance company.   Moreover, Defendant, Wells Fargo or its related entities, have received and retained kickbacks based on a percentage of the cost of the insurance premiums.  Defendants choose excessively-priced insurance policies for the motive of maximizing their own profits and unjustly enriching themselves. Accordingly, Defendants have received benefits that they have unjustly retained at the expense of the members of the Class.

129.    The circumstances are such that it would be inequitable for the Defendants to retain the benefit without paying the value thereof to the members of the Class.

130.    **WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demands judgment against the Defendants for compensatory damages, pre and post judgment interest, attorney's fees, declaratory and injunctive relief, costs incurred in bringing this action, and any other relief the Court deem just and proper.

## COUNT V

## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (APPLICABLE TO FLORIDA SUBCLASS ONLY)

131.    Plaintiffs re-allege and incorporate Paragraphs 1 – 100 above as if fully set forth herein and further allege as follows.

132.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. '501.201, *et seq.* ("FDUTPA"), prohibits "unfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

133.    Plaintiffs are "consumers" as defined in § 501.203(7) of the Florida Deceptive and Unfair Trade Practices Act.

134.    Defendants have engaged in, and continue to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Florida.

135.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of excessive fees for force-placed insurance by the Plaintiffs and which in turn were intended to generate unlawful or unfair kickbacks or commissions for Defendants.  Specifically, Defendant Wells Fargo had an exclusive relationship with Defendants Sterling National and QBE whereby they would purchase unreasonable and egregiously priced force-placed insurance policies and would then receive a kickback or commission based on a percentage of the insurance policy's premium.

136.    Defendants' conduct of charging an unreasonable and excessive fee for their force-placed insurance to Plaintiff and class members violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed within Florida which has an interest in prohibiting violations of FDUTPA.

137.    Plaintiffs and the Class members sustained damages as a direct and proximate result of Defendants' unfair an unconscionable practices.  Section 501.211(2), Florida Statutes, provides Plaintiffs and the class members a private right of action against Defendants and entitles them to recover their actual damages, plus attorney fees and costs.

138.     Plaintiffs and the Class members need not show actual reliance on the representations or omissions by the Defendants.  They need only show that the deceptive conduct would deceive an objective reasonable consumer.  *See Fitzpatrick v. General Mills, Inc.*, No. 10-11064, 2011 WL 1103005 * 3 (11th Cir., March 25, 2011).

139.     Plaintiffs and the class members have suffered and will continue to suffer irreparable harm if Defendants continues to engage in such deceptive, unfair, and unreasonable practices.

140.     **WHEREFORE,** Plaintiffs, on behalf of himself and all similarly situated individuals, demands judgment against Defendants for compensatory damages, pre and post judgment interest, attorney fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT VI

### VIOLATION OF THE REAL ESTATE SETTLEMENT AND PROCEDURE ACT ("RESPA") 12 U.S.C. § 2607

141.     Plaintiffs re-allege and incorporate Paragraphs 1 – 100 above as if fully set forth herein and further allege as follows.

142.     Plaintiffs' loans, as well as the loans of the class members, are federally related mortgage loans within the meaning of RESPA.

143.     Wells Fargo is a mortgage servicer or lender to whom the requirements of section of RESPA apply and is considered a "person" under section 2607.  *See* 12 U.S.C. § 2602.

144.     Pursuant to 12 U.S.C. § 2607, Defendants, Wells Fargo and/or Wells Fargo Insurance, is prohibited from accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, for the referral of any

business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

145.    The Department of Housing and Urban Development ("HUD"), in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." *See* 24 C.F.R. § 3500.2(b).

146.     HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" and in this definition, HUD states that settlement services include "provision of services involving hazard, flood, or other casualty insurance." *See* 24 C.F.R. § 3500.2(b).

147.    Plaintiffs' and the Class Members' mortgage documents contain the provision that gives the Defendants the discretion to choose force-placed hazard insurance to add to the borrower's mortgage payments.

148.    Plaintiffs and the Class Members are required to agree to this provision before signing the mortgage documents.

149.    Upon information and belief, Wells Fargo, pursuant to this provision, has a pre-arranged agreement or understanding with Sterling National and QBE to be the provider of this force-placed hazard insurance.

150.    This agreement or understanding has been specifically arranged to allow Wells Fargo and/or Wells Fargo Insurance to collect kickbacks and commissions for referring the force-placed insurance policies, called for by the mortgage documents, to Sterling National and QBE.

151.    As it is provided for in the mortgage documents and specifically

mentioned in the regulations, the provision that allows Wells Fargo to choose this force-placed insurance policy meets the definition of a settlement service.  *See* 24 C.F.R. § 3500.2(b).

152.    The referrals and placement of force-placed insurance through Sterling National and QBE constitutes, at a minimum, business "incident to" if not "a part of" the real estate settlement services under 12 U.S.C. § 2607.

153.    Wells Fargo or Wells Fargo Insurance, by accepting kickbacks and commissions specifically tied to the price of force-placed insurance through an agreement or understanding with Sterling National and QBE, have failed to comply and otherwise violated section 2607 of RESPA.

154.    As a result of violating section 2607 of RESPA, Wells Fargo and/or Wells Fargo Insurance is jointly and severally liable to the Class in an amount equal to three times the amount the Class Members were charged for the force-placed insurance policies.

155.    **WHEREFORE**, Plaintiffs and the Class members seek a judgment in their favor against Wells Fargo for treble damages related to the cost of the exorbitantly-priced force-placed insurance premiums arranged in violation of Section 2607 of RESPA, together with the costs of litigating this action including attorney fees.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs on behalf of themselves and all similarly situated individuals demand judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2) or Rule(b)(3) of the Federal Rules of Civil

Procedure and declaring Plaintiffs and their counsel to be representatives of the class;

(2)     Awarding damages sustained by Plaintiffs and the Classes as a result of Defendants' breach of the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(3)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(4)     Awarding damages – actual and additional as the court may allow – sustained by Plaintiffs and the class as a result of Defendants violation of section 2605 of the Real Estate Settlement and Procedure Act together with attorney's fees and costs;

(5)     Declaring the provision in the mortgage instrument relating to force-placed insurance to be procedurally and substantively unconscionable and requiring Defendants to refund an amount equal to all hidden profits or other financial benefits collected from Plaintiffs and the Class, and to rescind all such amounts charged but not yet collected from Plaintiffs and the Class by virtue of the provision;

(6)     Awarding damages, injunctive relief, declaratory relief, attorney's fees, and costs under Florida's Deceptive and Unfair Trade Practices Act;

(7)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(8)     Awarding treble damages as a result of Defendants violation of section 2607 of the Real Estate Settlement and Procedure Act together with attorney's fees and costs; and

(9)     Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted on April 7, 2011.


Lance Harke, Esq.
Howard Bushman, Esq.
Florida. Bar No. 863599
HARKE & CLASBY LLP
155 S. Miami Ave., Suite 600
Miami, Florida 33130
Tel: 305-536-8220/Fax:305-536-8229


Jeffrey N. Golant Esq.
1000 W. McNab Rd. Ste. 150
Pompano Beach, FL 33069
Tel:  (954) 942-5270/Fax: (954) 942-5272

/s/Adam M. Moskowitz
Adam M. Moskowitz, Esq.
Florida Bar No. 984280
Thomas A. Tucker Ronzetti, Esq.
Florida Bar No. 965723
Robert J. Neary, Esq.
Florida Bar No. 0081712
KOZYAK TROPIN &
THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134
Tel.: 305-372-1800/Fax: 305-372-3508

Chip Merlin, Esq.
Merlin Law Group
777 S. Harbour Island Blvd.
Tampa, FL 33602
Tel: (813) 229-1000/Fax: (813) 229-3692