UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RAY WILLIAMS, et al.,

               Plaintiffs,                         CASE NO. 1:11-cv-21233-CMA

v.

WELLS FARGO FINANCIAL SERVICES INC., et al,

               Defendants.

_____/

**THE WELLS FARGO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
COMPLAINT, AND INCORPORATED MEMORANDUM OF LAW**

      Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Local Rule 7.1,

Defendants Wells Fargo Financial Services Inc., Wells Fargo Financial Agency Company, Wells

Fargo Financial America Inc., Wells Fargo Financial Florida Inc., Wells Fargo Servicing

Solutions, LLC, Wells Fargo Financial Leasing Inc., Wells Fargo Financial System Florida Inc.,

and Wells Fargo Insurance (collectively, the "Wells Fargo Defendants") move to dismiss the

Plaintiffs' Complaint with prejudice, and submit the following memorandum of law:

**MEMORANDUM OF LAW**

**I.     FACTUAL BACKGROUND**

      Plaintiffs brought this putative class action on behalf of a class of homeowners whose

property insurance carriers dropped coverage on their property (for one reason or another), and

who were subsequently charged for lender-placed insurance.[1] Plaintiffs lump eight different

Wells Fargo entities and two surplus insurance carriers together in their Complaint without

_____

[1] Lender-placed insurance is a well-established practice in the insurance and financial industries whereby, if a borrower's coverage lapses, the lender will place insurance on the property to protect the collateral securing its loan. *See Wahl v. American Sec. Ins. Co.*, 2009 WL 1766620, n. 1 (N.D. Cal. Jun. 18, 2009) (describing lender-placed insurance, and citing *Telfair v. First Union Mortgage Corp.*, 216 F.3d 1333, 1340-41 (11th Cir. 2000) (also describing lender-placed insurance practice) and *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 642 (7th Cir.1995)).

distinguishing them from one another, without identifying what connection each Plaintiff had to each Defendant, and without providing facts specific to any particular Defendant. Plaintiffs allege that the collective "Defendants'" practice of placing insurance coverage on their property is unfair and results in excessive rates.

While the Complaint is a classic shotgun pleading and should be dismissed for that reason alone, there is more here than a simple lack of detail or care in the pleadings.  This case presents a unique dilemma for the putative class representatives and their counsel.  A good number of the putative class members in this case find themselves as members of this putative class solely because they have fallen behind and defaulted on their mortgages and could not pay for their own insurance. Given that many of the putative class members currently owe many multiples of the damages sought on their behalf here, the net recovery in this case (after foreclosure and deficiency counterclaims and set-off defenses are asserted) could easily tip away from the putative class members, resulting in foreclosure and net monetary judgments <u>against</u> them. Similarly, many of the putative class members have already had foreclosure judgments entered against them in Florida (and elsewhere), and since they did not bring the claims alleged here as compulsory counterclaims or defenses during those foreclosure proceedings, they are barred from bringing them now under the *Rooker-Feldman* doctrine or principles of *res judicata*. And, many of the putative class members actually benefited from the retroactive insurance at issue here because, absent retroactive placement, many actual insurance claims would not have been paid.[2]

---

[2] Retroactive insurance placement protects homeowners and lenders from claims that may have arisen during the gap-period, but that were latent or undiscovered at the time the coverage was placed. Retroactive coverage also can provide after-the-fact coverage for known losses that otherwise would be uncovered during the gap period.

Notwithstanding these serious threshold issues, Plaintiffs make the following allegations:

**Ray Williams**: Plaintiff Ray Williams obtained a mortgage from Wachovia Bank, which was subsequently serviced by one of the Wells Fargo Defendants (although Plaintiffs do not allege which one). Compl., ¶ 45. A copy of Mr. Williams' Mortgage is attached hereto as Exhibit A.[3]  According to the Complaint, Mr. Williams' insurance carrier for the property underlying his mortgage dropped coverage on October 17, 2010. *Id*., at ¶ 46. Mr. Williams allegedly secured new coverage on November 15, 2010, but discovered later that "Wells Fargo" had secured a lender-placed insurance policy during the intervening 29-day window (*i.e.*, October 18 through November 14), and had placed that policy on the property retroactively. Compl., at ¶ 47, 48, 50. Mr. Williams was apparently charged $1,743 for the lender-placed coverage at issue here.  He complains that it was too expensive.  Compl., at ¶ 51.

**Luis and Migdaliah Juarez**: Plaintiffs Luis and Migdaliah Juarez also obtained a mortgage from Wachovia Bank, which was also subsequently serviced by one of the Wells Fargo Defendants (although Plaintiffs do not allege which one).  Compl., ¶ 55.  A copy of the Juarez's Mortgage is attached hereto as Exhibit B. According to the Complaint, the Juarez's insurance carrier dropped coverage on March 3, 2010 due to damage to their roof.  *Id*., at ¶ 56.  The Juarezes admit that they were unable to obtain new coverage because no insurance company would insure the home until their roof had been completely fixed.  *Id*., at ¶ 57.  In July 2010, Wells Fargo secured a lender-placed insurance policy, retroactively effective from the March 3, 2010 termination date for the prior coverage. *Id*., ¶ 62.  Like Mr. Williams, the Juarezes claim that the policy premium was too expensive. *Id*, at ¶ 63.

All three Plaintiffs allege that the "excessively-priced" insurance premiums violate their

---

[3] While Plaintiffs do not attach their mortgages to the Complaint, the mortgages indisputably are integral to and form the basis of the claims in the Complaint.  As such, they may be considered by the Court without converting this motion to one for summary judgment. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

individual mortgage contracts (although they do not actually attempt to sue the contracting party) (*id.*, at ¶ 68), and that the Defendants' profit on the lender-placed insurance is excessive and unfair. Based on these allegations, Plaintiffs assert two contract-based claims (Counts I and III), two claims based on supposed violations of the Real Estate Settlement Procedures Act (Counts II and V), a claim under Florida's Deceptive and Unfair Trade Practices Act (Count V), and an unjust enrichment claim (Count IV).

As explained below, in addition to failing to allege sufficient facts to state a claim for any of these counts, Plaintiffs also sued entities with whom they have no relationship whatsoever, they lumped all eight Wells Fargo Defendants together without attempting to explain how each is involved in the supposed scheme, they asserted a claim under a section of the RESPA statute that is not yet even in effect, and their state law claims are preempted by the National Bank Act. The Complaint should be dismissed with prejudice.

## II.    **ARGUMENT**

### A.    **Counts I, III, IV, and V are Preempted by the National Bank Act**[4]

As a preliminary matter, Plaintiffs named eight different Wells Fargo companies in their Complaint without even attempting to distinguish them from one another, and without alleging how each was involved in their loans or in the misconduct alleged in the Complaint. In fact, many of the Wells Fargo Defendants had <u>nothing to do</u> with the Plaintiffs' loans or insurance on their properties. But even if Plaintiffs were able to allege a connection between their individual

---

[4] Title X, Subtitle D of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd Frank") modifies the preemption analysis described below, but the Dodd-Frank preemption amendment does not become effective until the "designated transfer date" (as defined in the Act). *See* Dodd-Frank Act, at Section 1048 (making the new preemption law effective on the "designated transfer date"). The Secretary of the Treasury has established the designated transfer date as July 21, 2011. *See* 75 Fed. Reg. 57252 (Sept. 20, 2010). The claims here should be analyzed under the preemption rules in effect when the claims arose, as Dodd-Frank does not require retroactive application of the new preemption rules. Indeed, Section 1043 of Dodd-Frank calls for prospective application.

loans and a proper Wells Fargo entity, Plaintiffs' state law claims (Counts I, III, IV, and V) would nevertheless be preempted by the National Bank Act, 12 U.S.C. § 1 *et seq*. ("NBA") because they conflict with Wells Fargo's federally authorized power to administer, service, and protect its loans.

a.    Federal Law Governs the Servicing of Loans and Placement of
Insurance by National Banks and their Operating Subsidiaries

For "[n]early two hundred years," the U.S. Supreme Court has "held federal law supreme over state law with respect to national banking." *Watters v. Wachovia Bank, N.A.,* 127 S.Ct. 1559, 1566 (2007). For much of that period, that federal law has been the National Bank Act ("NBA"), enacted in 1864 specifically to provide a "uniform and universal operation" for the business of banking throughout the country, *Talbott v. Board of County Comm'rs*, 139 U.S. 438, 443 (1891), and to "shield[] national baking from unduly burdensome and duplicative state regulations." *Watters*, 127 S.Ct. at 1566-67*; see Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10-11 (2003). The NBA and regulations promulgated thereunder by the Office of the Comptroller of the Currency ("OCC") were thus designed to establish a banking regulatory system "independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States." *Watters*, at 1568 (quoting *Easton v. Iowa*, 188 U.S. 220, 229 (1903)).

"There are three functions considered by the courts to constitute the core of the banking business: accepting deposits, lending, and cashing checks." *Bankers Ass'n of Ind. Inc. v. Clarke*, 766 F.Supp. 1519, 1528 (S.D.Ind. 1990). The NBA expressly authorizes national banks to perform each of these basic functions, and further authorizes them to engage in all activities incidental thereto. *See* 12 U.S.C. § 24 (Seventh) (granting national banks "all such incidental powers as shall be necessary to carry on the business of banking"). A national bank's incidental lending powers are broad. They include not just the initial act of making a loan, but also the

5

continuing administration and servicing of the account, and any action that is "convenient or useful in connection with the performance of one of the bank's established activities." *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002) (internal quotation marks and citations omitted). A national bank's servicing activities and protection of its collateral through insurance are part and parcel of its lending powers.

"Under 12 U.S.C. § 93a, the OCC is authorized 'to prescribe rules and regulations to carry out the responsibilities of the office' and, under 12 U.S.C. § 371 to 'prescribe by regulation or order' the 'restrictions and requirements' on national banks' real estate lending power without state-imposed restrictions." Office of the Comptroller of the Currency, Preemption Final Rule, 23 No. 1 OCC Q.J. 28, 7, 2004, available at 2004 WL 2360325. In amending the preemption rules in 2004 to specifically include consumer protection provisions, the OCC acted to "ensure the soundness and efficiency of national banks' operations by making clear the standards under which they do business." *Id.* at 9. OCC regulations possess the same preemptive effect as the NBA. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Taking Plaintiffs' allegations as true for purposes of this Motion, Plaintiffs allege that the Wells Fargo Defendants are all subsidiaries of Wells Fargo Bank, N.A. (Compl., ¶¶ 33, 34) – which is a national bank regulated by the Office of the Comptroller of the Currency.[5] The United States Supreme Court has held that operating subsidiaries of national banks are treated as equivalent to, and are subject to the same oversight, regulations, protections, and obligations as their parent companies. *See Watters,* at 18-21; *see also* 12 C.F.R. § 7.4006 ("Unless otherwise

---

[5] As noted, Defendants take Plaintiffs' allegations as true for the purposes of this Motion. Defendants acknowledge, however, that Plaintiffs' characterizations of the Wells Fargo Defendants' corporate structures are not at all accurate. Unfortunately, this problem has been compounded by Plaintiffs' "shotgun" lumping of claims and defendants together, and pleading claims against entities with whom they have no relationship whatsoever. If Plaintiffs were to name the entity with whom they actually had a relationship, it likely would be Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A.

provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank").

   b. Florida Law May Not Obstruct, Impair, or Condition a National Bank's Powers

  Because federal law is supreme in relation to state law, to the extent that any application of Florida law might be deemed to obstruct, impair, condition, or otherwise restrict the ability of a national bank to fully exercise the powers granted to it by the NBA, that law is preempted and inapplicable with respect to national banks. *See Watters*, 127 S.Ct. at 1567; *Barnett Bank of Maria County, N.A. v. Nelson*, 517 U.S. 25, 32-347 (1996).  Among other provisions, 12 C.F.R. § 34.4 specifically provides that a national bank may make real estate loans without regard to state law limitations concerning, among other things, "[t]he terms of credit," issues related to insurance and "other credit enhancements or risk mitigants," and the "servicing…[of] mortgages." Moreover, 12 C.F.R. § 7.4002 provides that a national bank "may charge its customers non-interest charges and fees," and that the determination of such charges and fees are "business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." A "significant objective of 12 C.F.R. § 7.4002 is to allow national banks to charge fees and to allow banks latitude to decide how to charge them." *Baptista v. JPMorgan Chase Bank, N.A.*, 2011 WL 1772657, at n.2 (11th Cir. May 11, 2011);[6] *see also* 12 U.S.C. § 92 (authorizing national banks to sell various forms of insurance).

  More to the point, the OCC has determined that "the sale of…credit related insurance is part of, or incidental to, the business of banking," and that insurance for a bank's collateral is "directly related to, and logical outgrowths of, a bank's authority to make loans because they

---

[6] The Eleventh Circuit in *Baptista* assumed without analysis that the Dodd-Frank preemption amendment was already effective.  That is not the case.  As discussed above, the Dodd-Frank preemption amendment goes into effect on the designated transfer date, which is set for July 21, 2011.  *See* note 4, *supra*.

protect a bank's ability to recover payment on loans to borrowers." *See* OCC Interpretative Letter #812, issued December 29, 1997, at 1-4, attached hereto as Exhibit C. In Interpretive Letter #812, the OCC discussed in detail the federally authorized powers of national banks to engage in insurance related activities – including lender or "force" placed insurance.  Interpretive Letter # 812 also demonstrates that the OCC intends to regulate a national bank's insurance related activities, including providing insurance for the protection of its collateral.

The OCC has also published a handbook (attached hereto as Exhibit D), entitled "Insurance Activities, Comptroller's Handbook," in which it declares that the OCC is responsible for the "supervision of national banks' insurance activities," and that "state laws generally cannot 'prevent or restrict' insurance activities conducted by national banks and their subsidiaries." Exhibit D, at 1-3. The handbook also specifically authorizes national banks to engage in the procurement and sale of insurance through subsidiaries and captive agencies, to protect the bank's collateral through insurance, and to collect fees related to that insurance – the exact type of activity alleged as "misconduct" here.  *See, e.g., id.*, at 10 ("A national bank may act as a finder to bring together potential purchasers and sellers of insurance," and "may receive a fee" related thereto). The handbook also pronounces, in no uncertain terms, that the OCC is responsible for regulating these activities. That the OCC considers itself responsible for that regulation should be given deference and near conclusive weight by this Court. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[7]

Since it is the OCC, not state law, that regulates national banks' insurance-related activities, state laws that obstruct or impair these activities do not apply to national banks. In

---

[7] Moreover, in *Abels v. JPMorgan Chase*, Case No. 1:09-cv-21123-JLK (S.D.Fla.), cited in Plaintiffs' Complaint, at ¶ 31, the Florida Office of Financial Regulation informed the plaintiffs that it did not have jurisdiction over the national bank defendant and the insurance issues in that case because the OCC regulates those types of issues.  *See* D.E. 18, at ¶¶ 19, 22, and Exhibits F, G, and L thereto. Indeed, the OCC appears to have opened an investigation into those claims. *See* Exhibit L. The national bank in that case did not move to dismiss on preemption grounds.

fact, state law may not intrude *even partially* on these types of activities. *See, e.g., Franklin Nat. Bank of Franklin Square v. New York*, 347 U.S. 373, 376 (1954) (noting how the NBA authorizes national banks to exercise their powers "without qualification or limitation").

This is true even if the state laws are aimed at consumer protection. *Am. Bankers Ass'n v. Lockyer*, 239 F. Supp. 2d 1000, 1016 (E.D. Cal. 2002) ("Consumer protection is not reflected in the case law as an area in which states have traditionally been permitted to regulate national banks"). The OCC has indicated that it will enforce consumer protection statutes (such as FDUTPA), and Congress has given the OCC authority to prosecute or sanction banks that engage in unfair or deceptive acts or practices. *See* 12 C.F.R. § 34.3(c) ("[a] national bank shall not engage in unfair or deceptive practices within the meaning of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1)); *see also Haehl v. Washington Mutual*, 277 F.Supp.2d 933 (S.D.Ind. 2003) (similar OTS regulation preempts state statute or judicial decision purporting to regulate loan-related fees or the processing and servicing of mortgages); *Weiss v. Wells Fargo Bank, N.A.,* 2008 WL 2620886 (W.D. Mo. Jul. 1, 2008) (state law preempted where it "impedes the OCC's exercise of its regulatory and enforcement powers, which also cover consumer protection").

        c.    The State Law Claims Here Would Obstruct, Impair, and Condition Wells Fargo's Federally Regulated Powers

In this case, Plaintiffs allege that the terms of the credit to which they agreed in their Mortgages (including the express term authorizing the lender or servicer to place insurance where the borrower lets it lapse – *see* Compl., at ¶ 103), were unconscionable, unfair, and deceptive. *See* Compl., at Counts I, III, IV, and V, including ¶¶ 105, 121, 128, 134, 69-70. Plaintiffs also complain that the fees they were charged for lender-placed insurance were excessive. Compl., at ¶¶ 68, 104, 120, 128, 135. In essence, Plaintiffs' state law claims seek to have the Court regulate: (a) the terms of credit to which they agreed; (b) the manner in which

Wells Fargo services its loans and places insurance on its collateral; and (c) whether the fees charged for the lender-placed insurance were excessive.

But as discussed above, these exact activities are part and parcel of the business of banking, and they are already regulated by the National Bank Act, its regulations, and the OCC. *See* Exhibit C, OCC Interpretative Letter #812, at 4-7 (demonstrating how the OCC regulates national banks' insurance-related activities associated with the protection of its collateral); Exhibit D, OCC Handbook (OCC is responsible for regulating national banks' insurance-related activities); 12 U.S.C. § 92 (national banks permitted to engage insurance related activities); 12 C.F.R. § 34.4 (national bank may make loans without regard to state law limitations concerning the terms of credit, insurance related issues, and other risk mitigants); 12 C.F.R. § 7.4002 (national banks may charge its customers non-interest charges and fees in its discretion according to safe and sound banking principles); *see also Martinez v. Wells Fargo Bank, N.A.*, 598 F.3d 549, 556 (9th Cir. 2010) (claims under a California consumer protection statute alleging excessive and unfair fees -- like those at issue here -- were preempted by the National Bank Act because "[i]n essence, the Martinezes argue[d] that these fees [were] too high, and ask[ed] the court to decide how much an appropriate fee would be…[but] the OCC has clearly provided how the fees are to be determined. Under 12 C.F.R. § 7.4002(b)(2), these are business decisions to be made by each bank").

Thus, it is the OCC – not these Plaintiffs, or this Court, or the Florida common law or legislature – that has authority to regulate banks' conduct with respect to the terms of credit, the placement of insurance, and to determine whether fees charged by the bank are excessive. A decision in Plaintiffs' favor here on their state law claims would have the same effect as a direct regulation of those activities, which are already regulated by the OCC.

The carve-out provision in 12 C.F.R. § 34.4(b)(1) for certain state contract issues does not save Plaintiffs' contract-based claims (Counts I and III) from preemption. The gravamen of each of the claims here, including the contract-based claims, is that the Plaintiffs were charged excessive fees for lender placed insurance, and that the Defendants collected kickbacks related to those fees. That type of activity, regardless of the label given to the cause of action, is governed and preempted by the NBA. *See Martinez*, 598 F.3d at 555-57; *Cf. Schilke v. Wachovia Mortg.*, 758 F.Supp.2d 549, 556 (N.D.Ill. 2010) ("the question of whether a contract claim is or is not preempted…turns on the conduct at issue, not the label given to the putative cause of action…. [A] breach of contract claim that alleges an utter failure to honor the express terms of a mortgage loan contract—for example, by charging a homeowner a higher annual interest rate than that specified in the mortgage agreement—might not be preempted…. However, if the conduct complained of in a breach of contract claim falls within the scope of federal authority concerning lending activities, it is preempted"); *Wier v. Countrywide Bank, N.A.*, 2011 WL 1256944 (E.D.Mich. Mar. 31, 2011) (common law claims preempted under the NBA).

The contract based claims here are, in realty, nothing but mislabeled consumer protection and unfair trade practices issues.  They do not relate to a complete failure to honor express terms of their contracts. Rather, they raise the same issues and seek the same type of relief as Plaintiffs' FDUTPA claim. Plaintiffs' request to have this Court regulate those types of issues is inconsistent with the uniform federal standard required by the NBA. Thus, even if Plaintiffs were able to adequately allege a connection between their individual loans and a proper Wells Fargo entity, their state law claims would be preempted by the NBA.

**B.**     <u>The Complaint Fails to State a Claim Upon Which Relief May be Granted</u>

    **1.**     **The Complaint is an Impermissible "Shotgun Pleading," and Fails to Meet the Requirements of Fed.R.Civ.P. 8**

The Complaint is also impermissibly vague and fails to satisfy the general pleading requirements of Rule 8. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). A complaint that takes the "shotgun" approach by naming several defendants in each count "is in no sense the 'short and plain statement of claim' required" by Rule 8. *Magluta v. Samples¸* 256 F.3d 1282, 1284 (11th Cir. 2001); *see also Lane v. Capital Acquisition and Management Co.*, 2006 WL 4590705 at *5 (S.D. Fla. 2006). A complaint cannot simply lump all the defendants together in each count, but instead must give some factual basis to distinguish the conduct of each defendant. *Lane*, 2006 WL 4590705 at *5 (Rule 8 standard not met when defendants are lumped together in each count and there is no basis to distinguish their conduct); *Pro Image Installers, Inc. v. Dillion*, 2009 WL 112953 *1-2 (N.D. Fla. 2009) (same).

Here, Plaintiffs' Complaint is replete with sweeping generalizations about how <u>all</u> of the Wells Fargo Defendants committed various types of misconduct. Each Wells Fargo Defendant is left to guess at how it supposedly contributed (if at all) to the schemes alleged in the Complaint, and to how it was involved in the Plaintiffs' loans or the insurance placed on their property. The Complaint does not satisfy Rule 8, and should be dismissed. *Lane*, 2006 WL 4590705 at *5; *Dillion*, 2009 WL 112953 at *1-2.

    **2.**     **The Complaint Fails to Meet the Pleading Requirements of Rule 9(b)**

The Complaint also fails to meet the requirements of Rule 9(b). All six claims in the Complaint rest on allegations that the Defendants were engaged in "unfair, deceptive, and <u>fraudulent</u>" practices [Compl., at ¶ 85 (emphasis added)], and that they engaged in a "scheme of

exclusive relationships, back-room deals, and kickbacks" [*id.*, at ¶ 31] involving "unlawful, deceptive, unfair, and unconscionable profiteering and self-dealing." *Id.*, at ¶ 2; *see also id.*, at ¶¶ 3, 24, 69, 71, 72, 81, 82 (alleging that the Defendants' practices were unfair and deceptive). Since these claims are all based on allegations of fraudulent and deceptive conduct, they must be pled with heightened particularity pursuant to Fed.R.Civ.P. 9(b). *See Brooks v. Blue Cross and Blue Shield of Florida*, 116 F.3d 1364, 1370 (11th Cir. 1997) (fraud must be alleged with particularity including the who, what, when, and where); *Serefex Corp. v. Hickman Holdings LP*, 695 F.Supp.2d 1331, 1343 (M.D. Fla. 2010) (the particularity requirements of Rule 9(b) likewise apply to claims grounded or sounding in fraud).

All six counts here fail to meet the requirements of Rule 9(b). Plaintiffs use the generic term "Wells Fargo" to refer to all eight Wells Fargo Defendants throughout the Complaint, and allege that their loans were serviced by "Wells Fargo" [Compl., ¶ 45], and that "Wells Fargo" force-placed insurance, and that "Wells Fargo" received various kickbacks and engaged in misconduct [*id.*, at ¶ 61, 64-67]. But they do not identify which "Wells Fargo" Defendant was involved in their loans, or which one actually received any "kickbacks," let alone what kickbacks were received or who at Wells Fargo was involved in the supposed scheme. Without more particularized allegations, the Complaint fails to satisfy Rule 9(b) and should be dismissed.

### 3. Each Count Should be Dismissed For Other Reasons

#### a. Count I (Breach of Implied Covenant) Should be Dismissed

Count I should be dismissed because none of the Wells Fargo Defendants are parties to the Plaintiffs' mortgage contracts. While every contract contains an implied covenant of good faith and fair dealing, a breach of the implied covenant "is not an independent cause of action, but attaches to the performance of a specific contractual obligation." *Centurian Air Cargo v. UPS Co.*, 420 F.3d 1146, 1151-52 (11th Cir. 2005) (quotations omitted); *Beach Street Bikes, Inc.*

*v. Bourgett's Bike Works, Inc.*, 900 So.2d 697 (Fla. 5th DCA 2005) ("good faith requirement does not exist 'in the air.' Rather, it attaches only to the performance of a specific contractual obligation"). It is also axiomatic that one not party to a contract cannot be held liable for a breach of that contract. *In re University Centre Hotel, Inc.,* 323 B.R. 306, 309 (Bankr. N.D. Fla. 2005).

The only contracts alleged in the entire Complaint are the mortgages securing Plaintiffs' properties. Compl., at ¶¶ 45, 55. Plaintiffs allege that Wachovia Bank originated their mortgages, and that "Wells Fargo" subsequently serviced the mortgages. *Id.* But they do not allege <u>which</u> Wells Fargo entity serviced their loans (it could not have been all of them), or how any of them were actually bound by the mortgage contracts. Nor do Plaintiffs even suggest how Wells Fargo Insurance (who did not even engage in loan servicing) is bound by those contracts.

Plaintiffs also fail to allege what express contractual obligation is at issue in their implied covenant claim. *Hospital Corp. of America v. Florida Medical Center, Inc.*, 710 So.2d 573, 575 (Fla. 4th DCA 1998) (the implied covenant "must relate to the performance of an express term of the contract"). Plaintiffs appear to allege that the Wells Fargo Defendants chose insurance companies in bad faith, failed to seek competitive bids, and assessed and collected excessive premiums [Compl., at ¶ 105], but they do not point to any actual provision in their mortgage contracts that dictates the parameters by which the Wells Fargo Defendants were supposed to engage in those activities. Without identifying a contractual provision upon which the Defendants were supposed to execute "in good faith," Count I fails as a matter of law.

b.   Count II (RESPA Section 2605) Should be Dismissed

In Count II, Plaintiffs allege that all the Wells Fargo Defendants violated Section 2605 of the RESPA statute by charging insurance premiums that are not "bona fide and reasonable…." Compl., ¶ 114. Count II is predicated entirely on the "***bona fide and reasonable***" language in

Section 2605 of the RESPA statute. Plaintiffs emphasize the importance of this language with italics and bold font.  *Id.*, at ¶ 111.

But Plaintiffs fail to realize that the "*bona fide and reasonable*" requirement in Section 2605 is not yet in effect. That language was added to the RESPA statute by Title XIV, Section 1463 of the Dodd-Frank Act, but those provisions do not become effective until after the newly created Bureau of Consumer Financial Protection finalizes its implementing regulations, which will not occur for some thirty months after the "designated transfer date."  *See* note 4, *supra*.

In other words, the "*bona fide and reasonable*" language that forms the basis of -- and predicate for -- Count II will not be effective law until sometime in early 2013. Clearly, the Wells Fargo Defendants cannot have violated a law that is not effective at the time the Complaint was filed (let alone when the conduct underlying the Complaint allegedly occurred).  Nor would litigating this claim now even be possible, as the new Bureau of Consumer Financial Protection has not yet implemented regulations to define the phrase "bona fide and reasonable."  Since the law underlying Count II is not yet effective, Count II should be dismissed with prejudice.

c.      Count III (Unconscionability) Should be Dismissed

Count III asserts a claim for "unconscionability" of the underlying mortgage contracts. This claim fails for several reasons. First, as discussed above, none of the Wells Fargo Defendants were signatories to the mortgage contracts at issue here (nor do Plaintiffs even make such an allegation). The Wells Fargo Defendants cannot be responsible for "unconscionable provisions" in contracts to which they are not allegedly bound.

Second, Count III also fails because Plaintiffs do not identify the express provision in their contracts that is "unconscionable." Plaintiffs vaguely reference a provision in Wells Fargo's "standard mortgage instrument," [Compl., ¶ 120] but, as demonstrated by Exhibits A and B, the Plaintiffs' mortgages are not the "standard" Fannie Mae/Freddie Mac mortgages upon which

Plaintiffs' seem to base their claims (and were not even with a Wells Fargo entity). Plaintiffs' failure to identify the unconscionable provision is fatal to their unconscionability claim.

<u>Third</u>, while it is not at all clear whether "unconscionability" is even a distinct cause of action under Florida law, Plaintiffs have not adequately alleged substantive <u>and</u> procedural unconscionability. Under Florida law, unconscionability requires both procedural and substantive unconscionability. *See Bland, ex rel. Coker v. Health Care and Ret. Corp. of Am.*, 927 So.2d 252, 256 (Fla. 2d DCA 2006). "Procedural unconscionability relates to the manner in which a contract is made and involves consideration of issues such as the bargaining power of the parties and their ability to know and understand the disputed contract terms." *Id.* Substantive unconscionability requires an assessment of whether the contract terms are so "outrageously unfair" as to "shock the judicial conscience." *Id.* (quoting *Gainesville Health Care Ctr., Inc. v Weston*, 857 So.2d 278, 285 (Fla. 1st DCA 2003)).

Here, Plaintiffs do not allege facts suggesting either procedural or substantive unconscionability. Plaintiffs fail altogether to provide any facts even suggesting that they actually lacked the ability to understand their contract terms and accept or reject them (*Bland*, 927 So.2d at 256), and do not adequately allege that an express mortgage term was substantively unconscionable. In fact, Plaintiffs' failure even to identify the actual mortgage term that is at issue here makes their claim too vague, and requires dismissal. *Twombly*, 550 U.S. at 555.

### d.    <u>Count IV (Unjust Enrichment) Should be Dismissed</u>

A claim for unjust enrichment under Florida law requires elements showing that: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefits conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff. *Hillman v Constr. Corp. v. Wainer*, 636 So.2d 576, 577 (Fla. 4th DCA 1994).

Here, Plaintiffs concede that they each failed to maintain the insurance required under their Mortgages. During that period, one or more of the Wells Fargo Defendants (although it is not clear which one) allegedly secured insurance for their properties. Plaintiffs allege that they were charged for the cost of this insurance, but they do not allege that they actually paid each of the Wells Fargo Defendants for those charges. Absent some allegation that Plaintiffs conferred a benefit on each Wells Fargo Defendant, Plaintiffs do not state a claim against all of them.

Moreover, "[w]hen a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails." *Baptista v. JPMorgan Chase Bank, N.A.*, 2011 WL 1772657, at n.3 (11th Cir. May 11, 2011). Here, as in *Baptista*, the Defendants allegedly charged Plaintiffs a fee because they had conferred a benefit on the Plaintiffs (*i.e.*, insurance coverage when they could not otherwise obtain it). Since Plaintiffs concede that the Defendants provided consideration for their insurance premiums, their unjust enrichment claim fails as a matter of law. *Id.*

The unjust enrichment claim also fails because it is barred by the Plaintiffs' Mortgage contracts. Under Florida law, "a quasi-contractual claim fails upon a showing that an express contract exists." *Berry v. Budget Rent A Car Sys., Inc.*, 497 F.Supp.2d 1361, 1369 (S.D. Fla. 2007). Here, Plaintiffs' unjust enrichment claim is premised on the theory that the Wells Fargo Defendants overcharged them for insurance. Yet, Plaintiffs acknowledge that their properties were uninsured, that they could not otherwise obtain insurance, and that their mortgage contracts permitted lender-placed insurance. Compl., at ¶¶ 68-70. Since the servicer had an express contractual right to insure the collateral, Plaintiffs' quasi-contract claim fails as a matter of law.

e.      Count V (FDUTPA) Should be Dismissed

In Count V, Plaintiffs allege a claim for violation of the Florida Deceptive and Unfair Trade Practices Act.  Count V should be dismissed with prejudice because FDUTPA expressly

exempts national banks, such as Wells Fargo Bank, N.A., from its scope. *See* Fla. Stat. § 501.212(4)(c) (2008) (exempting "banks or savings and loan associations regulated by federal agencies" from the provisions of the statute); *see also Bankers Trust Co. v. Basciano*, 960 So.2d 773, 779 (Fla. 5th DCA 2007) ("FDUTPA clearly excludes banks from its grasp.").

The United States Supreme Court has also held that operating subsidiaries of national banks are treated as equivalent to, and are subject to the same oversight, regulations, protections, and obligations as their national bank parent companies. *See Waters v. Wachovia Bank*, N.A., 550 U.S. 1, 18-21 (2007); *see also* 12 C.F.R. § 7.4006.[8] Accordingly, since Plaintiffs allege that the Wells Fargo Defendants are subsidiaries of Wells Fargo, N.A. (*see* Complaint, at ¶¶ 33-34), <u>and</u> because Plaintiffs' relationship was likely with Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A., the FDUTPA claim should be dismissed with prejudice.

Plaintiffs also fail to adequately allege a deceptive act. *See Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F.Supp.2d 1350 (M.D.Fla. 2007) (deceptive act is an element of FDUTPA). They have not alleged what is deceptive about Wells Fargo placing insurance on the collateral securing its loans (especially when it is expressly permitted by the contract), and do not allege how each Wells Fargo entity was involved in the supposed deception, or how the supposed deception is likely to deceive consumers.

f.    <u>Count VI (RESPA Section 2607) Should be Dismissed</u>

Section 2607 of RESPA addresses allowable charges that arise out of the closing of a mortgage loan.  It does <u>not</u> address charges made or incurred years after the closing of the loan (as here).  Plaintiffs appear to allege that all of the Defendants violated Section 2607(a) by

---

[8] While one Florida state appellate court has held that bank subsidiaries are not necessarily exempt from FDUTPA (*see Office of Attorney General, Dept. of Legal Affairs v. Commerce Commercial*, 946 So.2d 1253 (Fla. 1st DCA 2007)), that case came out <u>before</u> the United States Supreme Court's decision in *Waters*. This Court is bound by *Waters* and OCC regulations; not by a lone decision from the First District Court of Appeal.

including lender-placed insurance provisions in their mortgage contracts, and by later accepting "kickbacks" from QBE and Sterling. Compl., ¶¶ 147, 150, 153.  This claim fails for at least four reasons: <u>First</u>, none of the Wells Fargo Defendants were involved in the settlement of Plaintiffs' loans. Plaintiffs' loans were originated by Wachovia Bank. Compl., at ¶¶ 45, 55. According to the Complaint, one or more of the Wells Fargo Defendants took over the servicing of Plaintiffs' loans at some later point in time. *Id.* Since Plaintiffs do not allege how any of the Wells Fargo entities were involved in the original settlement of their loans, the Section 2607 claim fails.

    <u>Second</u>, RESPA has a one-year statute of limitations. 12 U.S.C. § 2614.  Since Plaintiffs have not alleged any reason to toll the statute of limitations for more than one year after the closing of their loans (which, as evidenced by Exhibits A and B, occurred more than one year before they filed this Complaint), the RESPA claim should be dismissed.

    <u>Third</u>, Plaintiffs fail to explain how each Wells Fargo Defendant was involved in the "kickback scheme." Their decision to lump all the Defendants together renders their claim insufficiently vague. *Lane v. Vitek Real Estate Industries Group*, 713 F.Supp.2d 1092 (E.D.Cal. 2010) (borrowers failed to plead RESPA claim where they did not explain which defendants received them, but instead lumped the defendants together).

    <u>Fourth</u>, Plaintiffs do not adequately explain how the so-called kickbacks had any relation to the settlement of their loans, as required by Section 2607. Section 2607(a) prohibits only kickbacks incident to or a part of a real estate settlement service.  "Settlement service" is defined in the statute (12 U.S.C. § 2602) and implementing regulations. *See* 24 C.F.R. § 3500.2.  Courts around the country have held that Section 2607 applies only to charges required <u>at settlement</u>; not to contingent fees that are charged later, such as here. *See, e.g., Bloom v. Martin*, 77 F.3d 318, 320-21 (9th Cir. 1996) (affirming dismissal of RESPA claim where fees were assessed after settlement because the regulations address only charges "a borrower is likely to be required to

pay at settlement"); *see also Greenwald v. First Fed. Sav. & Loan Ass'n*, 446 F.Supp. 620, 625 (D.Mass. 1978), *aff'd*, 591 F.2d 417 (1st Cir. 1979) (interest payments on escrow accounts are not a settlement practice under RESPA because they "can continue long after the closing of the mortgage transaction and which can continue to occur during the entire life of the mortgage"); *McAnaney v. Astoria Financial Corp.*, 357 F.Supp.2d 578 (E.D.N.Y. 2005) (post-settlement fees do not support a claim under Section 2607).

Here, according to Plaintiffs' Complaint, the supposed kickbacks occurred, if at all, only after (and if) the Plaintiffs' insurance lapsed and the Defendants were forced to place their own insurance on the property to protect the collateral – which, here, admittedly occurred <u>years after</u> the settlement of the loans.  These insurance charges and supposed kickbacks have nothing to do with charges incurred at settlement, and do not support a claim under Section 2607. For these reasons, Count VI should be dismissed with prejudice.

## III.   <u>CONCLUSION</u>

For the reasons discussed above, the Complaint should be dismissed with prejudice.

**CARLTON FIELDS, P.A.**
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368


By: /s/ David B. Esau
     Michael K. Winston
     Florida Bar No. 051403
     E-mail:  mwinston@carltonfields.com
     David B. Esau
     Florida Bar No. 650331
     E-mail: desau@carltonfields.com

*Attorneys for Wells Fargo Financial Services Inc., Wells Fargo Financial Agency Company, Wells Fargo Financial America Inc., Wells Fargo Financial Florida Inc., Wells Fargo Servicing Solutions, LLC, Wells Fargo Financial Leasing Inc., Wells Fargo Financial System Florida Inc., and Wells Fargo Insurance*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

/s/  David B. Esau
David B. Esau

## SERVICE LIST

| | |
|---|---|
| Lance Harke<br>Howard Busman.<br>**HARKE & CLASBY, LLP**<br>155 South Miami Avenue<br>Suite 600<br>Miami, FL 33130<br>Telephone: 305-536-8220<br>Facsimile: 305-536-8229<br>*Counsel for Plaintiffs*<br><br>By Notice of Electronic Filing | Adam Moskowitz<br>Thomas A. Tucker Ronzetti<br>Robert Neary<br>**KOZYAK TROPIN & THROCKMORTON, P.A.**<br>2525 Ponce de Leon<br>9th Floor<br>Coral Gables, FL 33134<br>Telephone: 305-372-1800<br>Facsimile: 305-372-3508<br>*Counsel for Plaintiffs*<br>By Notice of Electronic Filing |
| Jeffrey N. Golant<br>1000 West McNab Road<br>Suite 150<br>Pompano Beach, FL 33069<br>Telephone: 954-942-5270<br>Facsimile: 954-942-5272<br>*Counsel for Plaintiffs*<br>By Notice of Electronic Filing | Chip Merlin<br>Mary E. Fortson<br>Sean M. Shaw<br>**MERLIN LAW GROUP**<br>777 South Harbour Island Boulevard<br>Tampa, FL 33602<br>Telephone: 813-229-1000<br>Facsimile: 813-229-3692<br>*Counsel for Plaintiffs*<br>By Notice of Electronic Filing |
| William S. Berk<br>William Xanttopoulos<br>**BERK, MERCHANT & SIMS, PLC**<br>2 Alhambra Plaza<br>Suite 700<br>Miami, FL 33134<br>Telephone: 786-338-2851<br>Facsimile:  786-364-1814<br>*Counsel for QBE Insurance Corporation and Sterling National Insurance Agency*<br>By Notice of Electronic Filing | Andrew L. Sandler<br>Robyn C. Quattrone<br>Jennifer Peck<br>**BUCKLEY SANDLER LLP**<br>1250 24th Street, NW<br>Suite 700<br>Washington, DC 20037<br>Telephone: 202-349-8000<br>Facsimile: 202-349-8080<br>*Counsel for QBE Insurance Corporation and Sterling National Insurance Agency*<br>By Notice of Electronic Filing |