1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2              MIAMI DIVISION

3       Case No. 11-CV-21233-ALTONAGA/SIMONTON

4
   RAY WILLIAMS, ET AL.,
5

6
                 Plaintiffs
7  vs.                           MIAMI, FLORIDA
                                 OCTOBER 13, 2011
8

9  WELLS FARGO FINANCIAL CORPORATION,
   INC.,  ET AL.,
10

11               Defendants.

12
        TELEPHONIC HEARING TRANSCRIPT ON MOTION TO COMPEL &
13           PRODUCE SIX CATEGORIES OF DOCUMENTS
          BEFORE THE HONORABLE ANDREA M. SIMONTON,
14           UNITED STATES MAGISTRATE JUDGE

15
   APPEARANCES:
16

17 FOR THE PLAINTIFF:

18
                        KOZYAK TROPIN & THROCKMORTON
19                      2525 Ponce de Leon Boulevard
                        Suite 900
20                      Coral Gables, Florida 33134-6036
                        BY: ADAM M. MOSKOWITZ, ESQ.
21                      BY: ROBERT J. NEARY, ESQ.

22

23

24 REPORTED BY:         J.M. COURT REPORTING, INC.
                        JERALD M. MEYERS, RPR.
25                      Telephone:  954-431-4757

```
 1
 2                              HARKE CLASBY & BUSHMAN, LLP
                                9699 N.E. Second Avenue
 3                              Miami Shores, Florida 33138
                                BY: LANCE A. HARKE, ESQ.
 4
 5
      ALSO PRESENT:            SARAH ENGEL, ESQ.
 6
 7
 8
      FOR THE DEFENDANTS:
 9
10
11
12                             CARLTON FIELDS, P.A.
                                City Place Tower
13                             Suite 1200 Floor
                                525 Okeechobee Boulevard
14                             West Palm Beach, Florida 33401
                                BY: MICHAEL K. WINSTON, ESQ.
15                             BY: DAVID B. ESAU, ESQ.
16
17
18
      ALSO PRESENT:            BY: WILLIAM XANTTOPOULOS, ESQ.
19
20
21
22
      REPORTED BY:            JERALD M. MEYERS, RPR.
23                             J.M. COURT REPORTING, INC.
                                1601 N.W. 109TH TERRACE
24                             Pembroke Pines, FL 33026-2717
                                Telephone: 954-431-4757
25                             E-Mail Address: CRJM@AOL.COM
```

1    (Call to order of the Court)

2            THE COURT:  Calling case number 11-Civil-21233, Ray

3    Williams, et al versus Wells Fargo Financial, Incorporated, et

4    al.

5            Counsel, will you note your appearances for the

6    record, beginning with counsel for the plaintiffs, and let me

7    know if anybody is present with you on the line.

8            MR. MOSKOWITZ:  On behalf of the plaintiffs, Your

9    Honor, this is Adam Moskowitz, and with me is Robert Neary, an

10   associate in my law firm.

11           THE COURT:  Okay.  Thank you.

12           MR. HARKE:  Good morning, Your Honor.  This is Lance

13   Harke and Sarah Engel also on behalf of the plaintiffs.

14           THE COURT:  Okay.  Thank you.  Is there anybody else

15   on behalf of the plaintiffs?  Okay.  And on behalf of the Wells

16   Fargo defendants?

17           MR. WINSTON:  This is Michael Winston from Carlton

18   Fields on behalf of Wells Fargo Bank and Wells Fargo Insurance,

19   and in another office that are on the conference line is David

20   Esau, an associate with my firm.

21           MR. XANTTOPOULOS:  This is Bill Xanttopoulos on behalf

22   of QBE Specialty Insurance Company and QBE First Insurance

23   Agency, Inc, and I am by myself.

24           THE COURT:  Okay.  Thank you.  Before we begin,

25   Mr. Xanttopoulos, do you have a dog in this fight?

4

```
 1        MR. XANTTOPOULOS:  Judge, only remotely, in that I

 2   think there was an issue raised as to whether we would approve

 3   the production of certain documents or whether we had an

 4   objection, and I just would address that if that comes up.

 5        THE COURT:  Okay.  Fine.  We are here on plaintiff's

 6   emergency motion to compel the Wells Fargo defendants to

 7   produce 6 categories of documents.

 8        I have read the motion.  I have looked briefly at the

 9   deposition, although, quite frankly, I didn't have time to read

10   the entire deposition, but since I have heard from the

11   plaintiffs in the form of their written submission, let me ask

12   the defendants to respond.

13        I don't know who will respond on behalf of Wells

14   Fargo.  Mr. Winston or Mr. Esau.

15        MR. WINSTON:  I will, Your Honor.

16        THE COURT:  Okay.

17        MR. WINSTON:  Your Honor, at the outset, I couldn't

18   even begin to address all of the different mischaracterizations

19   and misrepresentations that are in the motion.

20        One of the key ones I do need to point out to the

21   court is Wells Fargo Bank and Wells Fargo Insurance are

22   different companies.

23        The motion treats them as one.  Wells Fargo Bank did

24   not even appear in this case until early September.  It wasn't

25   even served with the complaint until the middle of August.
```

1          So all of the representations about the delay tactics,

2     the patterns of delay and months and months and months of

3     non-responsiveness, Wells Fargo Bank has only been in this case

4     for a little bit over a month.

5          We have got very different business lines.  We have

6     got very different documents.  There are responses, although in

7     the motion they are presented as having a single response to

8     the discovery.

9          Their responses are different.  Wells Fargo Bank and

10    Wells Fargo Insurance responded differently to the discovery.

11         The other problem we have with the motion, Your Honor,

12    is we are not sure what we are arguing about here.

13         It appears that plaintiffs have filed an emergency

14    motion to compel a response to a letter that they sent last

15    week.  That's not a discovery request, Your Honor.

16         We didn't have 30 days to respond to it.  We didn't

17    object to it because we didn't have 30 days to respond to it.

18         It appears that they are trying to get a back door

19    production request in as opposed to actually sending us a

20    request for production that specifies these particular items

21    and gives us a chance to respond to it and then address it

22    through normal discovery.

23         THE COURT:  Excuse me.  Maybe I misread the motion,

24    but I saw 6 kinds of categories, but I also saw the specific

25    requests that were at issue that were listed in the motion.

1          MR. WINSTON:  And, Your Honor, if we are going to talk

2     about the specific requests, we can do that, but the motion is

3     a hodgepodge of everything.

4          It seems to attack deposition testimony.  It seems to

5     attack interrogatories.  It attacks responses to requests for

6     production, but then up front it doesn't seem to actually seek

7     relief as to any of that.

8          It just seems to want these 6 categories of production

9     which we don't necessarily know are included, and I don't think

10    we believe that they are included in any of the production

11    requests.

12         I mean, if they were, the production requests were not

13    clear enough to let us know they were seeking this information,

14    but, Your Honor, what we can certainly do is go through,

15    although I do not think they have appropriately asked for any

16    of these 6 categories, I think if these are the documents they

17    are concerned about, you know, we can certainly go through and

18    address what our positions are with regard to each of the

19    categories.

20         We have already produced during the process of

21    producing responses to much of it, and we can certainly talk

22    about what, you know, our position is with the rest of it, but

23    in that these were not the subject of discovery requests

24    before, at least not specific requests that we understood were

25    requesting these documents.

1           We think it is premature to be ordering us to produce

2      things on an emergency basis, particularly when we have had no

3      true opportunity to brief a response or set up our position or

4      get affidavits or present the court with any in-camera

5      information if we need to do that, but to the extent that the

6      plaintiffs are concerned about these 6 categories, we can

7      certainly walk through them.

8           THE COURT:  Okay.  I will tell all of you I have a

9      settlement conference starting at 10:00 o'clock.  So whatever

10     we do here needs to be done here very concisely.

11          Is that your full argument?

12          MR. WINSTON:  Well, honestly, Your Honor, I mean my

13     argument, Your Honor, would require me to go through the entire

14     deposition testimony.

15          It would require me to go through each of the

16     discovery responses one-by-one by one-by-one, and we would be

17     here for quite some time, which is I understand we don't have

18     that much time.

19          So if the plaintiffs want to go through these 6

20     categories, we can certainly do that, but in terms of the court

21     compelling us to produce them at this point, I think that would

22     be premature.

23          Certainly the court can direct us that this is where

24     you would go if we are required to do it, and we can then short

25     circuit any need for later motion practice on these issues.

1          THE COURT:  Okay.  I will tell you that I frequently

2     set discovery motions for hearing before responses are filed,

3     particularly in cases where there are deadlines and I allow the

4     parties to respond orally.

5          And, in fact, with Judge Seitz we never have motions.

6     We just have a notice of hearing, and then the parties state

7     their positions and we rule based upon the hearings.

8          So it seemed to me, when I looked through these 6

9     categories, that they were all included within the specific

10    requests that were listed following them, but it is possible

11    that they are not.

12         So what I am going to do is I am going to rule

13    one-by-one.  And whatever I order to be produced, I am going to

14    order to be produced by noon tomorrow.

15         You know, if I don't order anything to be produced,

16    then I won't, but I will say that I believe that you had ample

17    time, both on behalf of Wells Fargo Bank and Wells Fargo

18    Insurance, to study these requests.  Confer.

19         They have been pending for some time, and I understand

20    that discovery in this case is perhaps somewhat faster then

21    discovery in other cases, but that's the schedule Judge

22    Altonaga set.

23         So if you have some issue with that, you can go back

24    to Judge Altonaga, who I might add, denied your request for an

25    extension through September 28th.

1        MR. WINSTON:  Well, Your Honor, do you want to hear

2    argument as to each of the categories now?

3        THE COURT:  Well, what I am going to do is, because

4    you have objected to these categories and saying they are not

5    included within the requests, I thought the categories actually

6    were a very small subset of the requests, but I will go ahead

7    and rule on the broader requests and make my ruling based upon

8    the broader requests, if that is preferable then these 6

9    prelimited categories.

10       MR. WINSTON:  Well, Your Honor, I am not clear because

11   we had specific arguments as to each of these categories.

12       THE COURT:  But you have objected to the use of

13   categories.

14       MR. WINSTON:  Well, no.  What I am saying is on these

15   specific 6 items that they have requested, 6 categories, now

16   that we understand what this is what they are asking for, we

17   have specific arguments directed to these specific categories,

18   and I would like to make those specific arguments.

19       THE COURT:  Okay.  So you are saying you don't object

20   to the court using the categories instead of the specific

21   arguments.

22       I mean, I am going to shortcut this.  Mr. Moskowitz,

23   or, I don't know, Mr. Harke or Mr. Neary, Ms. Engel, I don't

24   know who is arguing on behalf of the plaintiffs here.

25       MR. MOSKOWITZ:  Yes, Your Honor.  I will.  This is

1  Adam Moskowitz.

2          THE COURT:  Okay Mr. Moskowitz as, to Category 1,

3  which request for production is this included in?

4          MR. MOSKOWITZ:  Request for production 3, 9, 13 and

5  interrogatory 4.

6          THE COURT:  And interrogatory 4.  Okay.  So request

7  for production 3 was all contracts and agreements between Wells

8  Fargo Bank or Wells Fargo Insurance and any other entity for

9  the placement of forced placed insurance coverage, and you want

10  a copy of the rate and rule manuals used by Assurant for only

11  LPI, which I assume is lender placed insurance?

12          MR. MOSKOWITZ:  Yes, Your Honor.

13          THE COURT:  And REO which is real estate owned

14  insurance for Wells Fargo and Florida, Texas, Louisiana and

15  California.  So let me look at 3.

16          9 is all documents describing a pricing for Wells

17  Fargo Insurance and Wells Fargo Bank, and number 13 is all

18  sales, policies, procedures, protocols, best practices,

19  guidelines and training curriculum and documentation regarding

20  your practice of writing or selling forced placed insurance,

21  and then interrogatory number 4 was the -- let me find

22  interrogatory 4 -- was describe the role or involvement you

23  have in arranging for securing, purchasing, providing or

24  procuring forced placed insurance, including but not limited to

25  all insurance companies, how the premiums are calculated, any

1    arrangements or agreements to secure, procure or purchase it,

2    and any agreements or contracts with QBE.

3              Okay.  So let me ask the plaintiff what, you know, you

4    can explain Category 1, and then I will have the defendants

5    respond.

6              MR. MOSKOWITZ:  Thank you, Your Honor.

7              The observation made in the beginning is exactly

8    right.  These 6 categories are an extremely small subset to the

9    documents and the information that we originally requested, and

10   because this is an emergency, these are documents that our

11   expert is specifically going to rely upon for his report on

12   Monday.

13             That's why we tried to narrow this, and we have had 3

14   meet and confers with Mr. Winston, and we did request these

15   documents all the way back to August.

16             So it is certainly a different picture.  What we are

17   trying to do now is just focus on what we really need at this

18   current time.

19             In this first request we asked in deposition the

20   30(b)(6) witness of Wells Fargo who, as you mentioned, Judge

21   Altonaga denied their motion for protective order.

22             She knew nothing.  Absolutely nothing.  She said, "I

23   am not prepared to answer any of the questions, including about

24   the rate and rule manuals."

25             That's why we need them.  We know that there is only

 1  two companies that write lender placed insurance for Wells

 2  Fargo.  Only 2.  It is Assurant and QBE.  That's the whole

 3  universe.

 4          So it is very important to be able to compare just

 5  these two vendors for tracking attorney the portfolio of

 6  11,000,000 loans.

 7          So you need to look at what the rate and the rule

 8  manuals are to compare Assurant to QBE so we can determine the

 9  reasonableness.  That's the heart of this whole case.

10          We know now from QBE that there is one woman, who is

11  an actuary, who set the rates 5 years ago.  They haven't

12  changed, and we are going to take her deposition in a couple of

13  weeks because QBE didn't know how the rates are even set.

14          We just want the know what is the rate and rule manual

15  for Assurant.

16          We know from deposition that it is standard insurance

17  practice to have a rate and rule manual for each state in which

18  they do business.

19          We know from the depositions they are easily

20  accessible, so that Wells Fargo can know that the correct

21  premium is charged to their customers, and that's why we

22  specifically just need the operate and rule manuals, and we

23  narrowed it from all of the states to only these 4 states in

24  which they do business.

25          THE COURT:  Okay.  Mr. Winston?

1        MR. WINSTON:  Mr. Moskowitz, can you clarify?  You

2   said 4 states?

3        MR. MOSKOWITZ:  Florida, Texas, Louisiana and

4   California, and we had meet and confers with Mr. Winston, and

5   we tried to resolve all of these differences.  That's why we

6   cut it down just to four states for this category.

7        MR. WINSTON:  Actually, Your Honor, I received this

8   letter, and the conference that I had with opposing counsel on

9   it was asking them to clarify, what is the word hazard

10  outsourcing services meant.  We never talked about this, but I

11  hear now that we are only doing Florida, Louisiana and

12  California, not Georgia, North Carolina, Pennsylvania, South

13  Carolina and Alabama.

14       THE COURT:  On page 6 it says, "Florida, Texas,

15  Louisiana and California."

16       MR. MOSKOWITZ:  Yes.  There is no confusion.

17       MR. WINSTON:  Well, I am looking at the letter that

18  was sent to me.

19       THE COURT:  Okay.  Well, I am not really that

20  concerned about the letter that was sent to you.

21       MR. WINSTON:  Okay.

22       THE COURT:  I am concerned about the motion that was

23  filed to compel.

24       MR. WINSTON:  Okay.  Let me respond then.  Okay.  The

25  first issue, Your Honor which is Assurant is a fall rate

1   company.  Okay.  Their insurance is all fall rates, which means

2   all of the information they are asking for, if they are looking

3   for the rates is available on the Internet.

4         They can go to the Florida Insurance Commission

5   Website and get it.  So the idea that this is an emergency, it

6   is surprising to me.

7         Beyond that, Your Honor, we never understood that they

8   were asking for rule and rate manuals for Assurant, a non-party

9   to this case until we received this letter.

10        I don't read any of their requests as saying, "We need

11  rate manuals."

12        Now, Your Honor, to the extent that Wells Fargo has

13  been provided with this information, Wells Fargo Bank or Wells

14  Fargo Insurance from Assurant, there is a contract with

15  Assurant that requires that Wells Fargo Bank and/or Wells Fargo

16  Insurance keep the information confidential, and that they not

17  disclose it, and Assurant is not here to fight this fight, Your

18  Honor.

19        So they don't know that this information is being

20  sought in this case, and I cite the court to a case called

21  Snowden, S-n-o-w-d-e-n.

22        THE COURT:  Excuse me a minute.  Before we get into

23  that, it seems to me you have just made, and I don't like to

24  cut counsel off, but it seems to me that you have made an

25  inherently contradictory statement, because at first you said

1   the rates and rules are publicly available on the Internet, and

2   now are you are saying that they are not; that it is

3   confidential.

4         MR. WINSTON:  Well, if I can clarify, Your Honor, and

5   explain why I am not contradicting myself.

6         It is to the extent information has been provided by

7   Wells Fargo by Assurant, Wells Fargo contracts with Assurant,

8   and I don't have the specific contract in front of me, but they

9   are standard contracts and requires that they keep information

10  that has been provided confidential, except to the extent that

11  it may be available publicly.

12        We don't know what publicly is out there and what is

13  not publicly out there, since Assurant has filed a rate, I am

14  assuming, I haven't gone to pull it all, that their rates are

15  out there in the public domain, but I don't know, and that's

16  not a decision for Wells Fargo Bank or Wells Fargo Insurance to

17  make.

18        That's a decision for the third-parties whose

19  proprietary and confidential information is being sought here.

20        That is what this information is seeking, is our

21  information that is potentially proprietary and confidential to

22  Assurant and forcing Wells Fargo to turn over information that

23  may be another company's proprietary information without giving

24  that company the opportunity to explain why that information is

25  proprietary and confidential we think would be improper, and

16

1   that's why I was directing the court to a case that says

2   exactly that.

3          The case is called Snowden versus Kanat Laboratories,

4   and it is 136 F.R.D. 694, and in that case it is the exact same

5   situation.

6          THE COURT:  What court is this?

7          MR. WINSTON:  That's actually a District Court from

8   Kansas.

9          THE COURT:  In what year?

10         MR. WINSTON:  1991.

11         THE COURT:  Okay.

12         MR. WINSTON:  And in that case it is a very similar

13   situation where there is an attempt to get proprietary

14   information from one of the defendants, and the defendant's

15   response was, "We have a contract that says we cannot produce

16   this information because the only reason we have it is because

17   we signed a confidentiality agreement," and what the court

18   held, and although the names are not going to match up

19   obviously because Belkin said the defendants should not be

20   required to produce documents or records which would require

21   them to violate their contract with Belkin or disclose any

22   information they do not possess.

23         The court agrees with this ruling of the magistrate.

24   The trade secrets of non-party Bilken are entitled to greater

25   protection.  The defendants shall not be required to disclose

1   any information regarding the Bilken vaccine which would cause

2   them to violate the confidentiality agreement with Bilken.

3        That's our situation, Your Honor.  It is Assurant's

4   information which is what is being sought here, not Wells

5   Fargo's information.

6        Now, to the extent that Assurant does not consider it

7   to be confidential or proprietary because it has filed its rate

8   and it is available, you know, on the Internet through a search

9   of the Florida Insurance Commissioner, that's the position for

10  them to take.

11       It is not Wells Fargo's position to argue whether

12  their information is confidential or proprietary, and forcing

13  us to turn over somebody else's proprietary information we

14  think would be incorrect, particularly since QBE is a

15  competitor, and QBE, likewise, has an agreement with Wells

16  Fargo, and this has been produced to the plaintiffs that quite

17  expressly says that Wells Fargo cannot turn over their

18  information without consent.

19       THE COURT:  Okay.  Any response, Mr. Moskowitz?

20       MR. MOSKOWITZ:  Yes, Your Honor.  This is the first we

21  have heard of this.  We have had many, many, many meet and

22  confers.  We have never heard this argument before.

23       It is a last minute argument thrown up by Mr. Winston

24  to prevent something that sounds illogical, as Your Honor just

25  noticed.

1        He is saying that the amount that we charge for

2   Assurant somehow should be sanctily confidential, but anybody

3   who really wanted to know the exact rate could just go on to

4   some data base and find the rate.  That's why it does not even

5   make logical sense.

6        Number 2, we have seen no contract.  I have never been

7   presented a contract.  They didn't provide this court with a

8   contract or any evidence at all which shows that this

9   information cannot be shared.

10       This is the same argument we had previous where we

11  asked for their revenues, and they argued that it would be

12  excessive and burdensome to do it, and Your Honor said to them,

13  "Well, where is the evidence?  Where is the affidavit?"  And

14  there was none.

15       So as a prima facie basis right now, certainly Wells

16  Fargo has not presented anything to this court that the court

17  could look at which would show that Wells Fargo has to maintain

18  this information in a confidential nature.

19       The sole thing they have raised is 12 objections to

20  this request, and the final one has a word saying, "It may be

21  confidential."

22       So my first argument is they have certainly not made a

23  sufficient basis in the record today to show that it is

24  confidential.

25       In fact, if anything, it is illogical because he is

1    saying that the actual numbers, which is what would be most

2    important, are not in any way treated confidential because they

3    are filed with each state around the country.  That's my first

4    argument.

5           Number 2, we have a confidentiality agreement in this

6    case.  And if that has any meaning and any purpose, it is

7    exactly for this, where there is information that they would

8    not want to get out to the public.

9           So we would, of course, treat all of this information

10   as confidential and, third, we served this request in August,

11   so there has been no showing for the last two months that

12   Mr. Winston or Wells Fargo made effort to contact Assurant,

13   even once.

14          We asked him yesterday, "HAVE you ever called QBE?"

15   Because one of his new grounds for not producing documents is,

16   "QBE may need to give their consent."

17          He has never in two months called QBE and said, "Do

18   you give us consent or do you not give us consent?"  I would be

19   interested to hear if he has ever called Assurant in the last

20   two and a half months to say, "Do you even mind if we give this

21   information?"  And he has not, then I don't think that would be

22   a valid objection.

23          MR. WINSTON:  Your Honor, if I could briefly respond?

24          THE COURT:  You can briefly respond.

25          MR. WINSTON:  I will first briefly respond, number 1,

| | |
|---|---|
| 1 | as I pointed out, I did not read, nor did my client read any of |
| 2 | the production requests to be requesting Assurant's rate and |
| 3 | rule manuals. |
| 4 | THE COURT:  Okay.  Excuse me, but, counsel, how can |
| 5 | you not read requests for production number 9 which states, |
| 6 | "All documents describing the pricing for Wells Fargo insurance |
| 7 | or Wells Fargo Bank's forced placed insurance" as not calling |
| 8 | for this information? |
| 9 | MR. WINSTON:  Your Honor, because the way this case |
| 10 | has been framed, we don't know whether it is claims dealing |
| 11 | with just QBE or whether it is claims dealing with Assurant for |
| 12 | the entire portfolio of loans. |
| 13 | Additionally, Your Honor, this is not Wells Fargo's |
| 14 | pricing.  Wells Fargo doesn't price the insurance.  So these |
| 15 | are third-party documents.  And, Your Honor, our position on |
| 16 | this, and I need do to correct some statements that |
| 17 | Mr. Moskowitz made. |
| 18 | You know, this issue about counsel saying we never |
| 19 | heard this about needing consent and confidentiality, Judge, I |
| 20 | sent them an e-mail, and I can read it to you that expressly |
| 21 | says that, and we have raised this issue with them. |
| 22 | We are in the process of getting QBE to approve |
| 23 | disclosure of their documents. |
| 24 | As to these particular documents, the argument is, |
| 25 | "You haven't presented the court with any contracts." |

1      Well, Judge, this has been brought as an emergency

2  motion.  In a 24 hour period since we had it, there was no way

3  for us to assemble all of these documents so that we can have

4  an in-camera hearing with the court or gets affidavits.

5      And, again, Your Honor, we were working with Ms. Engel

6  to determine whether things could be produced.

7      Again, Your Honor, the bottom line on this, this isn't

8  Wells Fargo's information.  This is a third-party's information

9  that they are asking for, and that third-party has a right to

10 come in and argue whether it should be produced or not.

11     THE COURT:  Well, you should have notified the

12 third-party so they could be here if that was the argument that

13 you were going to make.

14     Did you call them yesterday?  Did you call them

15 yesterday and tell them about this specific motion?

16     MR. WINSTON:  No, I did not, Your Honor.

17     THE COURT:  Did you call them on October 4th when you

18 both the letter that specifically referred to Assurant by name?

19     MR. WINSTON:  Your Honor, I was traveling to take

20 depositions noticed by one of the other attorneys in this case,

21 so I have not really been back to the office other than one

22 day, which I left early for Yom Kippur.

23     THE COURT:  Did anybody call them?

24     MR. WINSTON:  No, Your Honor.

25     THE COURT:  I mean when I say "you," I don't

1    necessarily mean you personally.  I mean anybody representing

2    Wells Fargo.

3              Well, I am going to order it to be produced.

4              MR. WINSTON:  Well, Your Honor, I don't know exactly

5    what Wells Fargo Insurance and Wells Fargo Bank has.

6              THE COURT:  Well, that's fine, but you should have

7    found that out.  So I am going to order, if you have a copy of

8    the rate and rule manual used by Assurant for only LPI and REO

9    insurance for Wells Fargo and Florida, Texas, Louisiana and

10   California, I am going to order it to be produced by noon

11   tomorrow.

12             And if Assurant wants to come in on an emergency

13   basis, Assurant can come in on an emergency basis, but it is

14   going to be produced by noon tomorrow.

15             If it needs to be turned back or clawed back based

16   upon Assurant's arguments, it can be, but if it is publicly

17   filed, I suspect they are not going to have any problem with

18   it, but if you didn't want to be in breech of your contract,

19   you should have told them about it so they could have made

20   their position known, and it will be subject to the

21   confidentiality order entered in this case.

22             Okay.  I need to find out if my settlement conference

23   is ready, because we may need to do this somewhat piecemeal.

24   Okay.  I am still waiting for one of my parties.

25             Okay.  Now, let's go on to item number 2.

1      MR. MOSKOWITZ:  Your Honor, since we are on limited

2  time, if we jump to some of the other ones, I can identify

3  where I think we have agreement and we don't need to take up

4  anymore of your time.

5      THE COURT:  Okay.

6      MR. MOSKOWITZ:  On item number 3, we have produced to

7  the Wells Fargo side of the information.  We are waiting on QBE

8  to approve documents from QBE that have their side of the

9  information.

10     THE COURT:  Okay.  Is that what you are here on,

11 Mr. Xanttopoulos?

12     MR. XANTTOPOULOS:  Yes, Your Honor.  We received the

13 documents that they were planning to produce about an hour and

14 45 minutes before the hearing.

15     We have people reviewing them.  I don't know if there

16 is going to be an issue, but I am told that we can have a

17 definitive understanding whether we have an objection by 2:00

18 o'clock.  Maybe it will be sooner.

19     THE COURT:  Well, they need to do a quick review as

20 opposed to a document by document review.

21     I am going to recess the hearing when this settlement

22 conference begins, and then I will be meeting with the parties

23 and then I will be reconvening the hearing, but I would suggest

24 that, and I have to tell you that, quite frankly, listening to

25 you, Mr. Winston, and reading the requests and your responses

24

1    and noting the history of the litigation with respect to Wells

2    Fargo Insurance, reading the deposition transcript to the

3    extent that I did, I have never felt more strongly that a

4    defendant is stonewalling the process and acting in bad faith.

5           Well, there was one case where I think I did feel, I

6    did feel that way, and I think it might have been a case

7    Mr. Xanttopoulos was involved in, where I recommended a default

8    be entered against a defendant who I felt was stonewalling and

9    being disingenuous with the court.  So I am just letting you

10   know that I think that I have rejected many of your arguments

11   before.

12          To the extent that you say you should have produced a

13   privilege log, and you didn't, I am inclined to find the

14   privilege is waived.

15          I think that Wells Fargo is doing everything in its

16   power to keep the plaintiffs from getting sufficient

17   information regarding their forced placed insurance so that

18   they will not be able to have any expert report.

19          I do not have any opinion on the merits of their

20   claims.  I don't know where it is true, whether it is false,

21   where they have a claim or they don't have a claim.

22          I have not gotten into the merits, even to the extent

23   that Judge Altonaga did in the motion to dismiss, but I think

24   they are entitled to everything that shows what was charged and

25   how they determined the charge for forced placed insurance.

1  And if you want to briefly address that argument, Mr. Winston,

2  you can.

3       I understand Wells Fargo Bank is in a slightly

4  different position then Wells Fargo's Insurance.  However, they

5  are represented by the same counsel and, therefore, the time

6  that it would normally take a newly added defendant to get up

7  to speed I think is somewhat mitigated.

8       MR. WINSTON:  Your Honor, first the deposition

9  transcript was not the Wells Fargo Insurance deposition

10  transcript.

11       It was the Wells Fargo Bank.  The Wells Fargo

12  Insurance transcript actually contains detailed information

13  from the Wells Fargo Insurance representative.

14       Your Honor, I understand what you are stating based on

15  what is before you, but we are not making any effort, making

16  any efforts to stonewall whatsoever.

17       We are just trying to figure out what the plaintiffs

18  need and trying to figure out if we can get it to them.

19       One of the complexities here is these loans are

20  Wachovia loans, and Wells Fargo took over Wachovia, so there is

21  an added level of complexity of getting documentation from

22  Wachovia's side of the business.

23       In terms of the other documents, you know, Your Honor,

24  as I said, we are producing number 3.

25       On number 4, we are waiting on QBE to tell us whether

1    they can provide this.  If you see number 4, that is actually

2    documents that were sent by QBE to Wells Fargo.  So those are

3    not Wells Fargo's documents.  So we are waiting for QBE to tell

4    us whether we can produce that.

5         THE COURT:  Was QBE served with copies of these

6    responses to the requests for production?

7         MR. WINSTON:  Yes.

8         THE COURT:  So QBE, Mr. Xanttopoulos, has been on

9    notice for a long time that this is what has been requested.

10        So QBE should be prepared pretty quickly, and, quite

11   frankly, I don't know if QBE was served with similar requests

12   and responded to it, but, you know, I guess I will hear about

13   that at some point.

14        MR. XANTTOPOULOS:  Well, Judge, I think that if you

15   would ask the plaintiffs, we have been very responsive to

16   document requests in this case --

17        MR. MOSKOWITZ:  Yes.

18        MR. XANTTOPOULOS:  -- for all discovery.

19        THE COURT:  And I think that that has been made clear

20   up to this point.  It is just now when I am hearing that

21   because there were documents produced by QBE, that QBE needs to

22   take, you know, or it wasn't notified or it wasn't aware of the

23   documents.

24        It would seem to me that these documents, if they are

25   clearly relevant to the issues in the case, should be in a

1    position that states the monthly reports of hazard outsourcing

2    activities and charges sent by QBE showing charges to Wells

3    Fargo by loan number, you should be able to look at that and

4    see whether or not you have an objection.

5            MR. XANTTOPOULOS:  Your Honor, we have pressed Wells

6    Fargo.  Wells Fargo raised the argument that documents were

7    confidential, at least to us.

8            We pressed Wells Fargo.  Well, if that is the case,

9    show us the documents to see if we have an issue.  We got them

10   this morning.  We have people looking at them.

11           From what I can tell I think, you know, there may not

12   be a problem, but we just need at least to see what they are

13   talking about with respect to it, or whatever.  That's all that

14   is going on.  We are going to be very responsive.

15           THE COURT:  Okay.

16           MR. WINSTON:  And, Your Honor, on number 5, I am being

17   told that the report that they seem to be asking for does not

18   exist.

19           However, we are producing and have already produced

20   higher level management reports that have comparable

21   information.

22           It is just not at a borrower by borrower level.  If we

23   get down to having to talk about whether we are going to

24   produce individual borrower level information, then we do have

25   multiple levels of confidentiality problems, but I don't

1   believe that the report that they are asking for exists, but we

2   have already produced what we think is comparable information.

3          It is just not at the borrower level, and we would ask

4   that after plaintiffs review it, they can let us know if it is

5   not sufficient for their needs.

6          On number 6, I have been told by my client that Wells

7   Fargo Bank, nor Wells Fargo Insurance neither have this

8   information.

9          It is not a report that exists.  And if this report

10  was to be prepared, if it, indeed, could be prepared, the

11  information would have to largely come from QBE.

12         So this is not an existing document that is now or

13  could be produced, and we don't have the information to produce

14  it, even if it could be manufactured.

15         THE COURT:  Okay.  Let me hear from you,

16  Mr. Moskowitz.

17         MR. MOSKOWITZ:  Well, on the QBE issue,

18  Mr. Xanttopoulos is right.  They have been very productive and

19  cooperative as of up to today, and I would be really extremely

20  surprised if they didn't simply just grant the approval or

21  consent.  So I am sure that shouldn't be an issue.

22         On number 6, our expert has told us that this data

23  must be maintained by Wells Fargo.  So they must have every bit

24  of this information.

25         I don't know what else to say.  I mean, if Mr. Winston

29

1    I guess will file an affidavit and say, "We cannot process the

2    information, or we can't print it out in a report," I guess I

3    will have to simply accept that.

4         Our expert tells us that regulations require them to

5    maintain all of the information in Category 6.

6         THE COURT:  Okay.  And you are saying Wells Fargo Bank

7    would be required to maintain that information?

8         MR. MOSKOWITZ:  Correct, Your Honor.  That is what our

9    expert is saying, that it must be collected and maintained for

10   auditing that is done on each of these loans; that Wells Fargo

11   Bank must maintain this information.

12        Typically it goes to an argument that is very

13   important in this case of exactly what amounts were paid on

14   these lender placed policies, because what Wells Fargo argues

15   is that no one actually pays the amounts that are charged, and

16   this information is necessary to analyze issues, including the

17   defendant's claim that many of the borrowers didn't pay the

18   premiums charged, and it identifies the scope of the potential

19   damages in this case.

20        MR. WINSTON:  Your Honor, I can certainly go back and

21   revisit this issue with my client and drill deeper with them,

22   but I am being told that no such document exists, and I am

23   being told that QBE would have to provide the information.

24        It could be that bits and pieces of it from are from

25   Wells Fargo and bits and pieces of it are from QBE, but I don't

1   know, but I will certainly go back and drill down and see if I

2   can get further information, but I would note, Your Honor, that

3   then this appears to be asking for individual borrower level

4   information which is going to get us into all types of areas of

5   privacy and financial privacy laws for all 50 states, as well

6   as Gremley-Riley and other federal statutes, but I will

7   certainly go back to my client and drill down and see if I can

8   figure out if there is some way to generate this information.

9        From what I can calculate on the information I have,

10  it would be somewhere maybe 500,000 names long or more.

11       MR. MOSKOWITZ:  Your Honor, all we would want is

12  whatever information Wells Fargo Bank or Wells Fargo Insurance,

13  just like we did at the last hearing.

14       Whatever is reasonably accessible, whatever bits of

15  information that they currently have within their possession

16  that they could print out in a report to us is all that we

17  seek, and there is no privacy concerns.

18       We are not asking for any of the peoples' names, their

19  address, or anyway that we would be able to identify who there

20  are.  So there are no privacy concerns here, but whatever

21  reasonable inquiry by Wells Fargo could produce to us is all we

22  are seeking.

23       THE COURT:  Okay.  When you say this information is

24  not available, I am not sure what part of this information is

25  not available, Mr. Winston, or is that you don't know when

1    Wells Fargo paid a net premium greater then zero to QBE?

2            Is that it?  You don't know which loans involve that

3    and which loans don't involve that?  I am not sure.

4            MR. WINSTON:  Your Honor, the answer is the nature of

5    the relationship with QBE first.

6            What Wells Fargo has done is it has outsourced large

7    aspects of its escrow and insurance business, and I will give

8    you an example.

9            If you get a letter that is on Wells Fargo letterhead

10   regarding insurance, and you call the number, you reach

11   somebody at QBE.

12           So where is the information resident?  Well, it has

13   been outsourced to QBE and QBE is maintaining it.

14           So does Wells Fargo have bits and pieces of it?  Yes,

15   but other aspects of it they don't have, nor could they get it

16   without going to QBE to get the information.

17           THE COURT:  But they do have control of it and could

18   go to QBE and get the information because it is Wells Fargo's

19   information.  It is merely being held by QBE, correct?

20           MR. WINSTON:  If a report could be prepared, it is

21   possible, yes, but it would have to be a conglomeration of QBE

22   generating information and Wells Fargo generating information

23   and whether those two could be merged into some type of a list,

24   I don't know, Your Honor.

25           What I have been told at the second, third and fourth

1  pass from my client is that they cannot generate this list, and

2  it doesn't presently exist, but, Your Honor, again, I will

3  certainly drill down and call them again, and perhaps we will

4  get a conference call with the QBE people and see if we can

5  figure out a way to do it, but, again, by my calculation, the

6  list would be potentially 500,000, 600,000 or 700,000 lines

7  long or more.

8         MR. MOSKOWITZ:  Your Honor, if I could briefly

9  respond.  This is a very basic request.

10         I mean, the term "net premium greater then zero," it

11  actually is a defined term in the industry.  People know what

12  that means, and it refers to lender placed insurance policies

13  which were placed which have a positive premium that was

14  ultimately collected.

15         What it excludes are policies that were placed in

16  error because the borrower, for example, did have the required

17  insurance, and consequently a full refund was made.

18         So all this is, is a list of the actual lender placed

19  policies which were paid, and it is something that, according

20  to our expert, it is always maintained, and it is something

21  that they would continuously review because it is essential to

22  identify the number of policies placed, the amount of premiums

23  and related charges that were added to the loans and the

24  related amounts collected from the borrowers.  It is a pretty

25  basic chart that they should have.

1      MR. WINSTON:  Your Honor, again, I have been told that

2  it doesn't exist, and it is not information which is resident

3  on Wells Fargo side of the equation, but I will drill down

4  further, and if I need to get a call together with the QBE's

5  attorneys and their IT people to see if this can done, we will

6  certainly do that, but I am being told that it doesn't exist at

7  this point, nor can they generate it.

8      THE COURT:  Okay.  And in terms of like the volume of

9  the information, this is all electronic.  So, I mean it is a

10 disk, basically.

11     MR. WINSTON:  Your Honor, the systems that they run

12 are not new systems.  They are rather ancient, so their

13 capabilities at times are not very good.

14     THE COURT:  Okay.

15     MR. WINSTON:  There is a great deal of frustration as

16 to the employees and at Wells Fargo and myself.

17     THE COURT:  Okay.  Well, I want an affidavit by 5:00

18 p.m. today regarding the production of this information, and I

19 will also just say that the fact that Wells Fargo has chosen to

20 let somebody else maintain part of their records does not

21 excuse Wells Fargo from the obligation to produce that

22 information because it is within your custody and control.

23     On the other hand, QBE has certain information, but I

24 don't know that QBE has everything, but I guess what I am

25 saying is that it is your obligation to produce a set of

1    information that is integrated.

2         You cannot just divide your information among two

3    computers and say, "Well, I can't produce it because I have

4    elected to divide it between two computer systems."

5         I don't find that very persuasive in terms of a

6    burden, but you can provide an affidavit that will explain in

7    detail why it is you cannot produce this information.  And if,

8    for example, whatever bank regulating entity is asking you for

9    the information, if you would tell them you don't have it, then

10   you can tell us the same thing, and that's with respect to 6.

11        With respect to monthly reports of amounts added to

12   borrower's loan, Mr. Moskowitz, that's number 5.  It says they

13   are going to provide to you an upper level report that has the

14   same information.

15        MR. MOSKOWITZ:  I know last night at 9:00 o'clock,

16   around 9:00 o'clock we got e-mailed some documents.

17        I was looking through them this morning.  This morning

18   there is a chart or a report, so I can certainly review it this

19   morning.

20        I was trying to look at it, but I didn't really

21   understand it.  I can show it to our expert and try to figure

22   out what it means.

23        THE COURT:  Okay.  Is that the report you were

24   referring to, Mr. Winston?

25        MR. WINSTON:  We had previously produced it, but when

1    I looked at what we had produced, the copy was not particularly

2    clear, so we re-scanned it and sent it.

3            Hopefully, Adam, it should be a report that shows

4    average increase in monthly escrow with the line.

5            And, Your Honor, not to overly complicate it, but it

6    is lender placed insurance.  If the policy is purchased, the

7    borrower typically doesn't get a bill for whatever the policy

8    is.

9            It is an escrow advantage.  It is paid by Wells Fargo

10   Bank.  It is an escrow event, and then in accordance with the

11   Federal Statute RESPA, there is a calculation that is performed

12   whereby certain aspects of it, along with other charges, are

13   then added to escrow monthly taxes and escrow premiums, but the

14   report that I provided to Mr. Moskowitz shows in different

15   tiers of the business line increases for monthly escrow.

16           And if you could take a look at that and advise us

17   whether that it is sufficient for his needs, and if not, then

18   we will discuss it and see what else we can get.

19           THE COURT:  Okay.

20           MR. WINSTON:  Being I am told that that report does

21   not exist in the form that they are asking for.

22           THE COURT:  Okay.  Mr. Moskowitz?

23           MR. MOSKOWITZ:  Sure, Your Honor.  We will look at

24   that and let Mr. Winston know if there is additional

25   information that we require.

1          THE COURT:  Okay.  Moving right along, we have already

2     discussed the QBE documents in 3 and 4.

3          I have handled one.  That leaves us with number 2, a

4     copy of quarterly and annual performance or experience reports

5     from Assurant regarding hazard outsource and lender placed

6     insurance, REO property insurance.

7          MR. WINSTON:  Your Honor, this is again, these are

8     Assurant documents, not Wells Fargo.  So we have the same

9     confidentiality issues.

10          Additionally, you know, this information is very

11     broad, and we don't understand what the relevance of it is to

12     the claims that are being made in the case, and I would note

13     that even QBE has asserted that this information is

14     confidential and proprietary.

15          So, Your Honor, that is the basis for our objection.

16     You know, I understand you have already ruled as to number 1,

17     but this is definitely information that is not publicly

18     available, and these reports are not Wells Fargo's reports.

19          These are insurance reports and Assurant, the contract

20     with us says they are proprietary, but I understand your

21     position and your ruling with regard to number 1, so I won't

22     belabor the point, but I don't see the relevance of this

23     information, particularly as broadly as it is worded.

24          THE COURT:  Okay.  Mr. Moskowitz?

25          MR. MOSKOWITZ:  Yes.  I am just confused, Your Honor.

1    In request for production number 3, it states, "All contracts

2    and agreements between you," which is Wells Fargo Bank

3    Insurance and Wells Fargo Bank, "and any other entity other

4    than the above named defendant for the placement of forced

5    placed insurance coverage."

6          I don't think there is anything that could have been

7    clearer in August that we were seeking materials from Assurant.

8          There is no dispute that there are only two companies

9    in the entire world that provides forced placed insurance for

10   Wells Fargo Bank and Wells Fargo Insurance, and that is

11   Assurant and QBE.

12         So to somehow think that, you know, for Wells Fargo to

13   say now, "We just learned that these requests may relate to

14   another company, such as Assurant," it is just hard to imagine.

15         This is the same as request number 1.  According to

16   our expert, there's companies, as I said Mr. Winston admits

17   have to provide these reports to Wells Fargo about specifically

18   lender placed insurance.  It is annual, quarterly and monthly

19   periodic reports about the experience of the program.

20         THE COURT:  Okay.  Well, you are saying that and I am

21   not sure this fits in with request for production number 3.

22         MR. MOSKOWITZ:  It doesn't, Your Honor.  I was just

23   raising the point before where Mr. Winston said he didn't know

24   that they would have to seek any consent or documents from

25   Assurant.  So I was just using that as an example.

1           I think that this request is clearly covered by

2     requests 3, 4 and 5 in total going back to what documents would

3     specifically be responsive to each category back in August, but

4     there is no dispute that these exist.

5           Wells Fargo has these quarterly and annual performance

6     reports from Assurant, and we are just specifically seeking

7     them for lender placed insurance, and the reason is because

8     they will give specific examples of the number of certificates

9     issued by type of coverage, the amount of premium charged to

10    Wells Fargo, the number of claims, the amount of claims and the

11    commissions paid.

12          These are all standard business practices.  That's

13    going to go to the heart of this whole case of are these

14    amounts reasonable?  How much in actual claims were made; how

15    much were actually paid in claims for lender placed insurance,

16    and then that's the way that insurance companies figure out if

17    a rate is reasonable based on how much it is costing the

18    company.

19          That's why these reports are so important.  So there

20    is no burdensome argument here.  The sole argument was he never

21    asked Assurant for their permission.

22          MR. WINSTON:  Well, Your Honor, that was not the only

23    argument.  That is one argument which is Assurant has not given

24    us approval to produce this, and I don't see that is requested

25    for.

1          The issue is relevance to the claims.  Why Assurant's

2     information is relevant to QBE's policy pricing, I don't

3     understand that, particularly when Assurant has their own

4     methodology for calculating rates and their own loss

5     information, and so I am unclear on why we are being requested

6     to produce this.

7          Our position, Your Honor, as to all of these is when

8     we get a production request that says, "Give us your contracts

9     with everybody under the sun that has anything to do whatsoever

10     with underplaced insurance," Your Honor, obviously, we are

11     going to object to that because it is facially overbroad

12     because it is not tied to any specific issues in the case, and

13     that's why we objected to their request.

14          Then, Your Honor, again, we would ask that we not have

15     to produce this information.  It is Assurant proprietary

16     information, and I do not think the plaintiff has established

17     that it is relevant to any of the claims that they have

18     asserted in this case.

19          THE COURT:  Okay.  Mr. Moskowitz?

20          MR. MOSKOWITZ:  Your Honor, it is extremely relevant.

21     These are all Wells Fargo's customers.  The people that are

22     charged lender placed insurance are Wells Fargo Bank customers,

23     and they get charged by Wells Fargo Bank.

24          Your mortgage, the reason that people are in

25     foreclosure today, one large reason is these charges that Wells

1    Fargo Bank tacks on to your mortgage, they are the ones who are

2    charging the customers.

3         They outsource it to Assurant and to QBE to provide

4    the insurance, but the insurance is put on their customers

5    charged to their customers' mortgages.

6         There are only two companies in the whole world that

7    are charging lender placed insurance rates for Wells Fargo,

8    Assurant and QBE.

9         So how Assurant and what Assurant's rates are is very

10   relevant to determining if the rates that are charged by QBE to

11   Wells Fargo's customers is reasonable or not.

12        That's why the first request is relevant.  So this is

13   the same type of report that will be provided by Assurant to

14   Wells Fargo.

15        It is within Wells Fargo's possession, custody and

16   control without a doubt.  They have them.  They have to

17   maintain them, and it shows how or why the rates that are

18   charged are reasonable.

19        MR. WINSTON:  Your Honor, we have already produced,

20   and I would ask Mr. Moskowitz to take a look at this -- Wells

21   Fargo produced a management level report on a state-by-state

22   basis on a different tier of coverage basis that compares the

23   average premiums on Assurant's rates, on Assurant's issued

24   policies, and I am mushing this together because Assurant

25   doesn't issue policies.

1          They have various insurance companies that actually

2     issue the policies versus QBE.

3          So I would ask Mr. Moskowitz to take a look at that

4     chart and see if that is sufficient to meet their needs,

5     because it sounds like that is what he is arguing.

6          He is arguing that he needs information so he can

7     compare Assurant to QBE, and we have produced the management

8     level reports that compares the two rates that are being

9     charged in all 50 states.

10          MR. MOSKOWITZ:  Your Honor, as to that, that is not

11     our position.  We have one power point presentation that was

12     produced last night in color which gives a few tidbits of

13     information.

14          That is nothing compared to quarterly and annual

15     performance reportings from Assurant which is a very specific

16     request which Wells Fargo has within their possession and

17     control right now which will be very important in terms of

18     underlying data which we need for our expert report.

19          MR. WINSTON:  I don't want to belabor this, Your

20     Honor, but I still haven't heard any explanation as to why they

21     needed this for their expert report.

22          And, Your Honor, I do want to say that some of the

23     confusion and problems on our side have been caused by the

24     plaintiff's responses to discovery requests to us.

25          We wanted to figure out what it is exactly the

1    plaintiffs are going to be doing in terms of trying to show the

2    unreasonableness of premiums that were charged to their

3    clients, and we asked for in a specific interrogatory asking

4    them to explain this to us, and their response was that they

5    couldn't tell us, and that they were not going to tell us, and

6    this was actually going to be the subjects of our motion to

7    compel when we put it on file.

8          So when we say, "How are you going to do this, what is

9    your methodology, what are the facts that you are going to rely

10   on to sort this out and to prove your case," they said, "We are

11   not going to tell you now.  We will tell you some time in the

12   future."

13         If they had said, "We are going to do the following

14   things," well, then, I think they could credibly argue that

15   what they are actually telling us is relevant to what they told

16   us they were going to do, but at this point their discovery

17   responses are saying, "We are not going to tell you how we are

18   going to figure this out."

19         Yet they are asking the court, based on a good faith

20   argument, to just give them all of this information so that

21   they can somehow come up with a plan.

22         MR. MOSKOWITZ:  Your Honor, I think we have been

23   arguing this back and forth for quite some time, so I don't

24   have anything further to add.

25         THE COURT:  Okay.  Well, I find that it is relevant.

1    It could form a basis for their expert opinion on the

2    reasonableness of the charges by QBE.

3            I am going to order it produced by noon tomorrow.  And

4    if Assurant has a problem, I suppose they can come in with

5    their own emergency motion for protective order.

6            I will order it produced under the terms of the

7    confidentiality order that is the subject, or that has already

8    been entered in this case, I believe.

9            So you should have alerted Assurant to the fact that

10   this was being requested and, you know, to the extent that you

11   haven't, and to the extent that they come in and they have a

12   problem, then their rights are protected by that, and the same

13   goes with respect to QBE.

14           Hopefully QBE won't have a problem, but if there is

15   some problem, you know, call back and I will put this back on,

16   you know.

17           We will have another telephonic conference if we need

18   to.  I have another settlement conference starting this

19   afternoon, but those are fluid in nature.

20           I can break away for a few minutes with respect to

21   specific issues, but I do believe that the plaintiffs need this

22   information.

23           They need it for their experts.  Judge Altonaga has

24   been very firm about the experts summary disclosure deadline of

25   October 17th, and so that is the deadline under which we are

1   working.

2            I suppose with respect to any other outstanding

3   discovery requests, the parties can discuss those issues

4   amongst themselves and determine whether, you know, a further

5   motion to compel is necessary with respect to those discovery

6   requests.

7            Is there anything else, Mr. Moskowitz, from the

8   plaintiffs?

9            MR. MOSKOWITZ:  No, Your Honor.

10           THE COURT:  Mr. Xanttopoulos, do you have anything

11   else?

12           MR. XANTTOPOULOS:  Nothing else, Your Honor.

13           THE COURT:  Okay.  Mr. Winston, do you have anything

14   else?

15           MR. WINSTON:  Not at this time, Your Honor.

16           THE COURT:  Okay.  Thank you very much.  We will be in

17   recess.

18           MR. WINSTON:  Thank you, Judge.

19           (Whereupon the proceedings were concluded)

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3            I hereby certify that the foregoing is an accurate

4     transcription of proceedings in the above-entitled matter.

5

      OCTOBER 14, 2011          S/JERALD M. MEYERS
6     _____          _____
           DATE                     JERALD M. MEYERS, RPR-CM
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25